MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2019 ME 87
Docket:      Cum-18-252
Argued:      April 10, 2019
Decided:     June 4, 2019
Revised:     November 19, 2019

Panel:       MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.*

TUCKER J. CIANCHETTE et al.

v.

PEGGY A. CIANCHETTE et al.

JABAR, J.

[¶1]  Peggy A. Cianchette, Eric L. Cianchette, PET, LLC, and Cianchette Family, LLC (collectively, Peggy and Eric) appeal from a judgment of the Superior Court (Cumberland County, *Warren, J.*) denying their motions for judgment as a matter of law and a new trial following a jury verdict in favor of Tucker J. Cianchette on his claims for breach of contract, breach of fiduciary duty, and fraudulent misrepresentation.  They argue that the court erred by (1) allowing Tucker to proceed on a claim of fraudulent misrepresentation based upon allegations that, at the time the contract was executed, Peggy and Eric did not intend to perform their obligations under the contract; (2) failing

---

*  Saufley, C.J., sat at oral argument but did not participate in the development of the opinion.

to give a requested jury instruction; and (3) allowing Tucker to proceed on a claim for breach of fiduciary duty when the parties' relationship was governed by a limited-liability-company operating agreement. We affirm the judgment.

## I. BACKGROUND

A. Facts

[¶2] The following facts, including all justifiable inferences, are drawn from the trial record as viewed in the light most favorable to the jury's verdict. *See Hansen v. Sunday River Skiway Corp.*, 1999 ME 45, ¶ 5, 726 A.2d 220.

[¶3] In 2012, the owner of Casco Bay Ford (the dealership)—a Ford vehicle dealership in Yarmouth, Maine—hired Tucker as general manager. A year later, the owner approached Tucker and offered to sell him the dealership and the real estate upon which it sits. Because Tucker lacked the financial resources to complete the purchase on his own, he brought the opportunity to Peggy and Eric Cianchette, his step-mother and father. Although the owner of the dealership was aware of Peggy and Eric's prospective roles in financing the purchase, he made it a condition of the sale that Tucker be a part-owner of the dealership because he "would have never sold the business to someone that [he] didn't know and was not in the car business."

[¶4]   Together, Peggy, Eric, and Tucker formed PET, LLC (PET), to purchase, own, and operate the dealership.  Peggy and Tucker are each 33% owners of PET, while Eric owns the remaining 34%.  Peggy was named manager of PET and remains in that role to date.  Peggy and Eric formed a separate company, Cianchette Family, LLC (Cianchette Family), to own the real estate where the dealership is located.

[¶5]   Because the dealership is a certified Ford Motor Company (Ford) dealership, Eric, Tucker, and Peggy each had to receive certain approvals from Ford.  Eric and Tucker were required to personally guarantee a "floor plan" line of credit to finance the dealership's vehicle inventory, which they sought from Ford Motor Credit Company, LLC (Ford Credit).  Tucker was approved as "dealer principal" or "F(ii)"—a person with proven capacity in the vehicle dealership business who is approved to be the face of the dealership and communicate with Ford.[1]   Additionally, Ford approved a lease agreement between PET and Cianchette Family for $23,000 per month.

[¶6]   In December 2013, PET and Cianchette Family completed their respective purchases of the dealership and the real estate.  Almost immediately following the sale, Peggy informed PET that the rent would be nearly tripled to

---

[1] Both Tucker and Peggy applied for F(ii) status, but only Tucker was approved.

4

$65,000 and would be paid to a third party, Top of Exchange, LLC—a company owned by Eric and a trust established for the benefit of Peggy and Eric's children, excluding Tucker.

[¶7]   The next year, Peggy, Eric, and Tucker began discussions about Tucker purchasing Peggy and Eric's shares of PET, leaving him as the sole owner of the dealership.  At Eric's urging, Tucker obtained a loan commitment letter from Androscoggin Savings Bank (Androscoggin).   When Tucker presented the commitment letter to Eric, however, Peggy and Eric rescinded the offer to sell their shares.  After Tucker pushed Peggy and Eric for a reason why they had had him seek a commitment letter for no reason, he was told "I guess we just wanted to see you fail."

[¶8]   In 2015, Peggy directed Michael Cianchette—her son and Cianchette Family's attorney—to move $600,000 out of PET's operating account with Ford Credit and into a new account at Merrill Lynch that was opened by forging Tucker's signature.  Because the Merrill Lynch account earned significantly less interest, and because Tucker's compensation was based on all income earned by PET, including interest, his compensation as general manager was reduced.  Additionally, Peggy, without any vote by PET's shareholders, made a $375,000 interest-free loan from PET to Cianchette

Family for use on a real estate project in Florida. Tucker had no interest in or knowledge of the real estate project. As of the trial date, the loan had not been repaid.

[¶9] That same year, Peggy and Michael approached Tucker at the dealership and presented him with a check for some of his share of PET's profits and an amendment to PET's operating agreement that they wanted him to agree to. The amendment would have converted Tucker's shares in PET into a new lower class of stock that would have allowed Peggy and Eric to take all profits. The amendment also included a waiver of claims for any and all violations of PET's operating agreement that may have occurred up to that point. Tucker refused to sign the amendment.

[¶10] In September 2015, Peggy, Eric, and Tucker again began discussing a sale of Peggy and Eric's interests in PET to Tucker. When Tucker agreed, Peggy and Eric presented him with a purchase and sale agreement that had been drafted by Michael. However, as a condition of the agreement, Tucker was required to first sign the amendment to PET's operating agreement that he had previously refused to sign. Once again, Tucker refused to the sign the amendment and, by extension, the purchase and sale agreement.

[¶11]  Two months later, Peggy and Eric presented Tucker with two separate purchase and sale agreements, one for their ownership interests in PET and one for the real estate, each agreement contingent on the successful closing of the other.  Peggy and Eric required him to pay a $150,000 nonrefundable deposit to enter into the agreements.  Eric later explained that he required the deposit because he wanted it to make it "hurt" if Tucker failed to close the deal.

[¶12]  Tucker paid the deposit and signed the agreements with Peggy and Eric.  The following provisions were included within the membership agreement and are pertinent to this appeal:

> 2.5 <u>Closing Date and Place.</u>  The consummation of the transactions referred to in this Agreement (the "Closing") shall take place on January 31, 2016 (the "Closing Date"). . . .  Notwithstanding the foregoing . . . Buyer shall have the right to extend the Closing Date for not more than thirty (30) days . . . provided the purchase price shall increase by $1,000 for each calendar day the Closing does not occur after January 31, 2016.

> . . . .

> 4.5 <u>Proof of Ability to Close.</u>  On or before November 30, 2015, Buyer shall provide Sellers with a pro-forma closing statement showing expected sources of funds sufficient to complete the transactions described herein. . . .  If Sellers, in their sole discretion, are not satisfied that the Buyer has sufficient funding to close on this transaction, the Sellers may terminate this contract without penalty by providing Buyer with written notice of termination on or before December 15, 2015. . . .

. . . .

6.2 Seller's obligations under this Agreement are contingent upon buyer having obtained from Ford Credit the release of any personal guarantees or other performance guarantees given by either of Sellers in regard to Casco Bay Ford's floor plan financing facilities and any other personal guarantees which either Seller has given in regard to PET or Casco Bay Ford to any person, including, but not limited to vendors, Ford Motor Company, governmental entities, and other credit providers. . . .

[¶13] To finance his purchase, Tucker secured a loan commitment from Androscoggin and expected the approval of a loan guarantee from the Small Business Association. Tucker also received the approval of Ford to move forward with his purchase and the approval of Ford Credit to secure a "floor plan" in his name alone. Tucker provided documentation of these approvals to Peggy and Eric. To his surprise, Peggy accused him of being dishonest in his disclosures and threatened to terminate the agreements unless Tucker signed a new contingency agreement that required him to provide new disclosures and that extended Peggy and Eric's termination right to January 15, 2016. Tucker signed the new contingency agreement, provided updated disclosures, and again received the necessary approvals to move forward with his purchase.

[¶14] Pursuant to section 6.2 of the membership agreement, Tucker was required to obtain the release of Peggy and Eric's personal guarantees related

8

to the dealership. To this end, Tucker sought and received a draft letter from Ford Credit in December 2015 that purported to release Eric from any future liability on the dealership's floor plan. There is no dispute that the letter did not release any past liabilities already accrued. At the time, however, Tucker believed that the letter was sufficient to satisfy the requirements of section 6.2 and, despite providing the letter to Peggy and Eric, received no indication that Peggy and Eric believed that the release was insufficient. A representative of Ford Credit testified that, had Peggy and Eric made Ford Credit aware that the draft letter was insufficient, a complete release of liabilities could have been provided on an expedited basis.

[¶15] In January 2016, as the closing date drew near, Peggy and Eric threatened to terminate the sale agreements unless Tucker executed a new amendment that terminated his right to extend the closing date and added several other new requirements to successfully close the sale. When Tucker refused to sign the amendment, Peggy and Eric purported to terminate the sale agreements in accordance with their section 4.5 termination right. On January 29, 2016, Tucker attended the scheduled closing.[2] Peggy and Eric had already traveled to Florida and did not appear.

---

[2] The closing date was moved up due to the original scheduled date, which fell on a weekend.

[¶16]   After the failed closing, Peggy and Eric placed Tucker on administrative leave from his position as general manager of the dealership. When Peggy and Eric later became aware that Ford could rescind the dealership's certification because there was no longer a dealer principal on site, they requested that Tucker return as general manager.  Tucker agreed, provided that they worked towards a new closing date in April 2016.  In March 2016, the parties initially agreed to the new closing date, but shortly after Tucker returned as general manager, Peggy and Eric informed Tucker that they would not be selling the dealership, that they had found a new general manager who had been approved as dealer principal, and that he was fired.

B.    Procedure

[¶17]   Tucker brought suit in June 2016, alleging (1) breach of the membership agreement; (2) breach of the subsequent agreement in March 2016; (3) fraudulent misrepresentation; (4) fraud in the sale of a security; (5) breach of fiduciary duty; and (6) breach of PET's operating agreement.[3]  Peggy and Eric brought several counterclaims, and the parties each moved for partial summary judgment.  The court granted summary

---

[3] Tucker and several investors formed CBF Associates, LLC, to complete the purchase of the real estate that Casco Bay Ford sits upon.  Because successful closing of the real estate agreement was contingent on the closing of the membership agreement, that sale also did not close.  As part of this action, CBF asserted its own claim for breach of the real estate agreement and prevailed at trial.

judgment in favor of Tucker on all of Peggy and Eric's counterclaims except dissociation,[4] granted Peggy and Eric summary judgment on Tucker's securities fraud claim, and denied summary judgment as to the remainder of Tucker's claims. *See Cianchette v. Cianchette*, No. CV-16-249, 2018 Me. Super. LEXIS 13 (Jan. 17, 2018).

[¶18]  Following a two-week trial, the jury returned a verdict in favor of Tucker on all claims and awarded him $3,100,000 for breach of the membership agreement, $213,000 for fraudulent misrepresentation, $23,000 for breach of PET's operating agreement, $550,000 against Peggy for breach of fiduciary duty, and $1,500,000 in punitive damages against Eric.[5]  Peggy and Eric filed a motion for a new trial, *see* M.R. Civ. P. 59, and a renewed motion for judgment as a matter of law, *see* M.R. Civ. P. 50(b), asking the court to set aside

---

[4] Pursuant to the Maine Limited Liability Company Act, a member of an LLC may be dissociated—i.e., removed as a member of the company—by judicial expulsion in certain enumerated circumstances.  31 M.R.S. § 1582(5) (2018).  Here, Peggy and Eric sought the judicial expulsion of Tucker as a member of PET.  Following the trial, however, the court granted judgment in favor of Tucker on the dissociation claim, leaving him as a member of PET.  Peggy and Eric do not challenge that judgment on appeal.

[5] Prior to the return of the jury's verdict, it was agreed that Tucker could not recover for both fraudulent misrepresentation and breach of the membership agreement, nor for both breach of fiduciary duty and breach of PET's operating agreement, because the respective claims were predicated on the same or similar conduct.  Accordingly, the court reduced Tucker's award for fraudulent misrepresentation by $213,000 and his award for breach of PET's operating agreement by $23,000 to prevent double recovery.

the jury verdict, both of which were denied by the court. This timely appeal followed. *See* M.R. App. P. 2B(c)(2).

## II. DISCUSSION

### A. Fraudulent Misrepresentation

[¶19] Peggy and Eric first argue that the court erred by denying their post-trial motion for judgment as a matter of law and by not setting aside the jury's verdict on Tucker's claim of fraudulent misrepresentation. "We review the denial of a motion for judgment as a matter of law de novo to determine if any reasonable view of the evidence and those inferences that are justifiably drawn from that evidence supports the jury verdict." *Russell v. ExpressJet Airlines, Inc.*, 2011 ME 123, ¶ 10, 32 A.3d 1030 (quotation marks omitted).

[¶20] In order to prevail on a claim for fraudulent misrepresentation, Tucker is required to prove five elements:

> (1) . . . a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance on it, and (5) the other person justifiably relies on the representation as true and acts upon it to the damage of the plaintiff.

*Drilling & Blasting Rock Specialists, Inc. v. Rheaume*, 2016 ME 131, ¶ 17, 147 A.3d 824 (quotation marks omitted). At issue here are the first two elements—a false representation of a material fact. Peggy and Eric argue that an intention

not to perform a contract, even when such an intention existed at the time of the execution of the contract, cannot support an action for fraudulent misrepresentation because it is not a false representation of a material fact. To support this, they rely, in large part, on *Shine v. Dodge*, 130 Me. 440, 443, 157 A. 318, 319 (1931). We disagree.

[¶21] In *Shine*, a disgruntled purchaser of stocks sued the seller. *Id.* at 441-42, 157 A. at 318-19. The seller argued that Shine could not prevail because Shine failed to "aver[] a misrepresentation by [the seller] of a material fact, but rather set[] forth expressions of opinion by [the seller] as to the merits of the stock, or the breach of a promise by [the seller] to guarantee dividends on it in case of a default." *Id.* at 443, 157 A. at 319.

[¶22] The seller's argument reflected the traditional rule by which liability for fraudulent misrepresentation, often termed "deceit," was judged. *Id.*, 157 A. at 319. In short, the viability of the action depended on whether the seller's statement was of fact or opinion. *Id.* at 446, 157 A. at 320. When the false statement was an expression of opinion, there was no liability. *Id.* at 443, 157 A. at 319. Before explaining that the purchaser had failed to prove her case for fraudulent misrepresentation because "a false statement as to the value of property is held to be merely an expression of opinion," we stated that it was

"well settled in this state that the breach of a promise to do something in the future will not support an action of deceit, even though there may have been a preconceived intention not to perform." *Id.*, 157 A. at 319. Since that time, however, we have stepped away from that "well-settled" notion.

[¶23] More recently, the Restatement (Second) of Torts has promulgated a broader rule, which states:

> One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.

Restatement (Second) of Torts § 525 (Am. Law Inst. 1977). Although our adoption of the Restatement's rule has not been explicit, we have cited it with approval on several occasions. *See Boivin v. Jones & Vining, Inc.*, 578 A.2d 187, 188-89 (Me. 1990); *Arbour v. Hazelton*, 534 A.2d 1303, 1305 (Me. 1987); *Letellier v. Small*, 400 A.2d 371, 376 n.3 (Me. 1979). We take this opportunity to explicitly adopt the Restatement's formulation of fraudulent misrepresentation and overrule the contrary rule stated in *Shine*.

[¶24] Pursuant to the Restatement, "[a] representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention." Restatement (Second) of Torts § 530(1) (Am. Law Inst.

14

1977).  This is true regardless of whether there is an express statement of intent because "a promise necessarily carries with it the implied assertion of an intention to perform." *Id.* § 530(1) cmt. c.  When, as the jury found, Peggy and Eric entered into the membership agreement with no intention of actually performing that agreement, they made a false representation.

[¶25]  Likewise, Peggy and Eric's false representation of their intent to perform their obligations under the membership agreement is not an expressed opinion, it is a fact and a fact that was material to the formation of the agreement.  As acknowledged in the comments to the Restatement, "[s]trictly speaking, 'fact' includes not only the existence of a tangible thing or the happening of a particular event or the relationship between particular persons or things, *but also the state of mind, such as the entertaining of an intention.*" *Id.* § 525 cmt. d (emphasis added); *see also id.* § 530(1) cmt. a ("The state of a man's mind is as much a fact as the state of his digestion.").[6]  Further,

---

[6]  For clarity, we note that neither this opinion nor the Restatement provides that every false representation of an opinion is actionable as fraudulent misrepresentation.  Rather, although the Restatement acknowledges that the "holding of an opinion" can be considered a fact much in the same way an intention can be—i.e., the fact of a declarant's state of mind—it finds it "convenient to distinguish between misrepresentations of opinion and misrepresentations of all other facts, including intention" because there is "a marked difference between what constitutes justifiable reliance upon statements of the maker's opinion and what constitutes justifiable reliance upon other representations."  Restatement (Second) of Torts § 525 cmt. d (Am. Law Inst. 1977).  It is only in this sense that the Restatement separates out and acknowledges that a misrepresentation of opinion may be actionable in the appropriate circumstances.  *See* Restatement (Second) of Torts §§ 538A, 539, 542-43 (Am. Law Inst. 1977) (defining "opinion" and stating the rules as to when an opinion may be justifiably relied upon).

because an intent to never perform the contract at the time of its execution is something that "a reasonable man would attach importance to . . . in determining his choice of action in the transaction in question," *id.* § 538(2)(a) (Am. Law Inst. 1977)—i.e., whether to enter into that contract—the existence of that intent is material. *See Mariello v. Giguere*, 667 A.2d 588, 590-91 (Me. 1995) (explaining that a fact was material when "a reasonable person would attach significance" to that fact).

[¶26]  This is not to suggest, however, that every false representation of intent is actionable as a tort.  The statement of the rule itself also highlights its limiting principle—the intent to not perform must be present *at the time* the parties are entering into the contract.[7]  *See* Restatement (Second) of Torts § 530(1) cmt. b ("If the statement is honestly made and the intention in fact exists, one who acts in justifiable reliance upon it cannot maintain an action of deceit if the maker for any reason changes his mind and fails or refuses to carry his expressed intention into effect.").  Where the intent not to perform arises at

---

[7] Peggy and Eric argue that the court erred by not explicitly instructing the jury that the intent to not perform must have existed at the time of contracting.  However, they did not make this argument to the trial court, and therefore this argument was not preserved for appeal. *See Clewley v. Whitney*, 2002 ME 61, ¶ 9, 794 A.2d 87.  When read as a whole, there is no obvious error in the court's instructions. *See Morey v. Stratton*, 2000 ME 147, ¶ 10, 756 A.2d 496.

16

some point *after* the contract is entered into, then the appropriate remedy lies solely in an action for breach of contract.[8]

[¶27] In this case, a reasonable view of the evidence and all justifiable inferences supports the jury's finding that Peggy and Eric entered into the membership agreement with the intent of never performing their obligations under that contract. The evidence also supports a finding that Tucker justifiably relied upon that false representation to his detriment. Accordingly, the court did not err by denying Peggy and Eric's motion for judgment as a matter of law.

B. Jury Instruction on the Ford Credit Release

[¶28] Next, Peggy and Eric argue that the court erred by denying their motion for a new trial based upon the court's refusal to give a jury instruction specifically stating that the draft letter from Ford Credit releasing Eric from future liability—given to Peggy and Eric in December, a month prior to the

---

[8] Although Peggy and Eric argue that a tort claim and a breach of contract claim cannot coexist based upon the same or similar conduct, the Restatement makes it clear that the existence of a tort claim for fraudulent misrepresentation is a separate cause of action that exists "whether or not the promise is enforceable as a contract. . . . [I]t is immaterial to the tort liability that the damages recoverable are identical with, or substantially the same as, those which could have been recovered in an action of contract if the promise were enforceable." Restatement (Second) of Torts § 530(1) cmt. c. Stated another way, one "who fraudulently induces another to contract and then also refuses to perform the contract commits two separate wrongs, so that the same transaction gives rise to distinct claims that may be pursued to satisfaction consecutively." *deNourie & Yost Homes, LLC v. Frost*, 893 N.W.2d 669, 682 (Neb. 2017) (quotation marks omitted). Any duplication in damages awarded for the contract and tort claims can be resolved by post-judgment judicial action, as the court took here.

January closing date—was insufficient, as a matter of law, to meet Tucker's obligation under section 6.2 of the membership contract. We review the denial of a motion for a new trial for an abuse of discretion. *See Seabury-Peterson v. Jhamb*, 2011 ME 35, ¶ 14, 15 A.3d 746.

[¶29] "[A] party can demonstrate entitlement to a requested instruction only where the instruction was requested and not given by the court and it: (1) states the law correctly; (2) is generated by the evidence in the case; (3) is not misleading or confusing; and (4) is not otherwise sufficiently covered in the court's instructions." *Clewley v. Whitney*, 2002 ME 61, ¶ 8, 794 A.2d 87. Additionally, the court's "refusal to give the requested instruction must have been prejudicial to the requesting party." *Id.*

[¶30] In regard to section 6.2 of the membership agreement, the court instructed the jury as follows:

> [S]ection 6.2 of the dealership contract included a condition that Tucker obtain releases of Eric and Peggy from any personal [guarantees] given to Ford Credit or any personal [guarantees] given to any other vendors, including Ford Motor Company. And that provision required releases for Eric and Peggy from any potential—potential personal guarantee liability with respect to the time period prior to closing as well as from any potential personal guarantee liability with respect to the time period after the closing. That condition was a requirement for closing but did not allow Eric and Peggy to terminate the dealership contract at [any time] prior to closing.

This instruction accurately informed the jury that Tucker was required to obtain a release for "*any* potential . . . personal guarantee liability" incurred by Peggy and Eric in relation to the dealership, including that incurred during "the time period prior to closing." The court's instruction also informed the jury that section 6.2 did not provide a mechanism by which Peggy and Eric could prematurely terminate the membership agreement. Therefore, taken as a whole, the court's instruction provided the jury with the appropriate interpretation of section 6.2 and what it required of Tucker prior to closing. *See id.* Further instruction as to adequacy of the specific draft release letter would serve only to "clarify a matter [already] addressed by the court." *Id.* ¶ 11.

[¶31] Regardless, even if it was error for the court not to specifically inform the jury that the draft letter was insufficient to meet Tucker's obligation under section 6.2, Peggy and Eric have not shown prejudice because that section of the membership agreement only required a complete release of Peggy and Eric's personal guarantees *prior to closing*. Peggy and Eric, however, purported to prematurely terminate the membership agreement, relying upon section 4.5 of the membership agreement, which only allowed for their unilateral termination based upon a subjective good faith belief that Tucker lacked adequate funding to close. Moreover, Ford Credit's representative

testified that, had he been informed of the insufficiency of the draft release, a complete release could have been provided on an expedited basis. That testimony, combined with Tucker's ability to extend the closing date by another thirty days, makes it such that the jury was entitled to find that Tucker had not failed to meet his section 6.2 requirement at the time that Peggy and Eric breached the contract, regardless of whether the jury found that the breach occurred when Peggy and Eric purported to prematurely terminate the agreement or when they failed to attend the scheduled closing.

[¶32] Therefore, it was not an abuse of discretion for the court to deny Peggy and Eric's motion for a new trial based upon the court's refusal to instruct the jury as to the insufficiency of the Ford Credit draft release letter.

C.      Breach of Fiduciary Duty

[¶33] Finally, Peggy argues that the court erred by denying her motion for judgment as a matter of law because Tucker could not have proceeded against her on a claim of breach of fiduciary duty arising from her role as PET's manager while also maintaining a claim for breach of PET's operating agreement. She argues that Maine's Limited Liability Company Act, 31 M.R.S. §§ 1501-1693 (2018), transforms any breach of fiduciary duty into a breach of PET's operating agreement that sounds solely in contract law. This presents a

question of statutory interpretation that we consider de novo. *See Caruso v. Jackson Lab.*, 2014 ME 101, ¶ 12, 98 A.3d 221.

[¶34] Maine's Limited Liability Company Act seeks "to give maximum effect to the principles of freedom of contract and to the enforceability of limited liability company agreements." 31 M.R.S. § 1507(1). To achieve this goal, the Act provides that the operating agreement of an LLC "governs relations among the members as members and between the members and the limited liability company." 31 M.R.S. § 1521(1). The default rules contained within the Act work to "backstop the agreement to the extent the agreement does not address a matter." Comm. Amend. A to L.D. 1580, No. H-819, Subchapter Cmts., Subchapter 2, at 69 (124th Legis. 2009). If both the LLC's operating agreement and the Act are silent on an issue, common law controls. *See* 31 M.R.S. § 1507(2).

[¶35] The Act expressly imposes fiduciary duties upon the manager of an LLC:

> **1. Good faith; diligence; care; skill.** Persons shall discharge their duties under this chapter in good faith with a view to the interests of the limited liability company and of the members and with the degree of diligence, care and skill that ordinarily prudent persons would exercise under similar circumstances in like positions. . . .
>
> . . . .

**3. Fiduciary duty.** Subject to the terms of section 1521, subsection 3, paragraph A, a member not involved in the management of a limited liability company does not have a fiduciary duty to the limited liability company, or to any other member, or to another person that is a party to or is otherwise bound by a limited liability company agreement, solely by reason of being a member.

31 M.R.S. § 1559(1), (3).  The operating agreement of an LLC may then limit,

expand, or eliminate those duties:

**3. Expansion, restriction or elimination of duties.** Except as provided in section 1611, a member's or other person's duties may be expanded, restricted or eliminated as provided in this subsection.

**A.** To the extent that, at law or in equity, a member or other person has duties, including fiduciary duties, to the limited liability company or to another member or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or other person's duties may be expanded or restricted or eliminated by provisions in a written limited liability company agreement; except that the implied contractual covenant of good faith and fair dealing may not be eliminated.

**B.** A written limited liability company agreement may provide for the limitation or elimination of any liabilities for breach of contract and breach of duties, including fiduciary duties, of a member or other person to a limited liability company or to another member or to another person that is a party to or is otherwise bound by a limited liability company agreement.

31 M.R.S. § 1521(3)(A), (B).

[¶36]  The operating agreement of PET does not include any provisions that would create, modify, or eliminate the fiduciary duties of its manager.  The closest provision speaks only to the liability of PET's manager, not the existence, limitation, or elimination of fiduciary duties:

> 5.4.1.  The Managers shall not be liable, responsible, or accountable in damages or otherwise to the Company or to any Member for any action taken or any failure to act on behalf of the Company within the scope of the authority conferred on the Managers by this Agreement or by law, unless the action was taken or the omission was made fraudulently or in bad faith or unless the action or omission constituted gross negligence.

*Compare* 31 M.R.S. § 1521(3)(A) (allowing duties to "be expanded or restricted or eliminated") *with* 31 M.R.S. § 1521(3)(B) (allowing for "the limitation or elimination of any *liabilities for breach of contract and breach of duties*, including fiduciary duties" (emphasis added)).  In the absence of provisions within the agreement addressing fiduciary duties, the default rules of the Act control, *see* 31 M.R.S. § 1559(1), and are not contractual in nature, *see Perry v. Dean*, 2017 ME 35, ¶ 14 n.5, 156 A.3d 742 ("[A] claim for breach of fiduciary duty is a tort claim.").  *See Lee v. Pincus*, No. 8458-CB, 2014 Del. Ch. LEXIS 229, at *25 (Del. Ch. Nov. 14, 2014) (explaining that a contract "preempt[s] the default fiduciary relationship" only when it "expressly address[es] [the] issue,

and thereby create[s] a right that is solely a creature of contract" (quotation marks omitted)).

[¶37] In this case, Tucker alleged that Peggy breached her fiduciary duty as manager of PET by failing to act in good faith toward the interests of PET and its owners by tripling the rent paid, transferring money into an account with a lower interest rate to punish Tucker, making a no-interest loan without approval, and attempting to shield herself from liability for these actions by requesting Tucker waive her breaches of the operating agreement. Although these allegations relate to the same or similar conduct as those forming Tucker's claim for breach of PET's operating agreement, Peggy's failure to discharge her duties as manager in good faith provides Tucker with an independent cause of action against Peggy. *See, e.g., PT China LLC v. PT Korea LLC*, No. 4456-VCN, 2010 Del. Ch. LEXIS 38, at *26, *32 (Del. Ch. Feb. 26, 2010) (stating that where "the fiduciary duty claims arise independently of the duties imposed contractually" by an operating agreement, the fiduciary duty claim may survive "even if both are related to the same or similar conduct").

[¶38] Accordingly, the court did not err when it denied Peggy's post-judgment motion for judgment as a matter of law based upon her

24

argument that Tucker could not proceed on a claim for both breach of fiduciary duty and breach of PET's operating agreement.[9]

The entry is:

Judgment affirmed.

---

Catherine R. Connors, Esq. (orally), Pierce Atwood LLP, Portland, and Lee H. Bals, Esq., Jennie L. Clegg, Esq., and Katherine M. Krakowka, Esq., Marcus Clegg, Portland, for appellants Eric L. Cianchette, Peggy A. Cianchette, PET, LLC, and Cianchette Family, LLC

Jennifer A. Archer, Esq. (orally), Timothy H. Norton, Esq., and Emily G. Atkins, Esq., Kelly Remmel & Zimmerman, Portland, for appellees Tucker J. Cianchette and CBF Associates, LLC

Benjamin P. Gilman, Esq., Maine Chamber of Commerce, for amici curiae of Maine State Chamber of Commerce and Associated General Contractors of Maine, Inc.

Cumberland County Superior Court docket number CV-2016-249
FOR CLERK REFERENCE ONLY

---

[9] To the extent that these claims do have an overlapping factual basis supporting them, the court properly remedied the issue by reducing Tucker's damages as to his claim against Peggy for breach of PET's operating agreement.