STATE OF MAINE                              BUSINESS AND CONSUMER COURT
CUMBERLAND, ss.                             LOCATION: Portland
                                              DOCKET NO. BCD-CV-2019-42
                                              (cons. w/ BCD-CV-2019-41)

| | | |
|---|---|---|
| TUCKER J. CIANCHETTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMBINED ORDER ON PENDING** |
| | ) | **MOTIONS** |
| ERIC L. CIANCHETTE ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

<u>INTRODUCTION</u>

This is a case about fiduciary duties in the context of a family's limited liability company. Plaintiff Tucker Cianchette sues his father and stepmother, Defendants Eric and Peggy Cianchette, along with the company they co-own, PET, LLC ("PET"). Plaintiff alleges Defendants have continued to engage in the wrongful conduct for which they were held liable in an earlier suit (the "2016 Action")[1] as well as additional wrongful conduct.

The matters presently before the Court are three motions brought by Defendants: a motion in limine to exclude the expert testimony of Mark Plourde, a motion for judgment on the pleadings as to Counts IV and IX of Plaintiff's Complaint, and a motion for summary judgment on Count I (Breach of the PET, LLC Agreement and Covenant of Good Faith and Fair Dealing), Count II (Breach of Fiduciary Duty), Count III (Damages for Diminution in Value and Lost Profits), Count V (Declaratory Judgment), Count VI (Dissociation), Count VII (Appointment of a Receiver), Count VIII (Injunctive Relief and/or Specific Performance) and Count IX (Punitive Damages) of Plaintiff's Complaint. Plaintiff opposes all motions. The Court heard oral arguments on January

---

[1] *Cianchette v. Cianchette*, No. CV-16-249, 2018 Me. Super. LEXIS 13 (Jan. 17, 2018), *aff'd*, *Cianchette v. Cianchette*, 2019 ME 87, 209 A.3d 745, *cert. denied*, 140 S. Ct. 469 (2019).

1

21, 2022 in which both parties appeared through counsel. For the reasons discussed below, the Court DENIES the motion to exclude, GRANTS the motion for judgment on the pleadings, and DENIES the motion for summary judgment.

BACKGROUND

In June 2016, Plaintiff Tucker Cianchette sued the Defendants for, among other things, fraud, breach of contract, and breach of fiduciary duties related to the operation of PET, as well their conduct in relation to a proposed sale of their PET membership interests. The breach of fiduciary duty verdict against Peggy was founded in large part on her actions as Manager of PET. The jury found her to have artificially inflated rent paid by PET to another LLC of which she and Eric were members and to have made loans to other commonly owned LLCs while acting as Manager of PET. As a result of the 2016 Action, Tucker was awarded $5,900,000 in damages on March 5, 2018. The Law Court affirmed the judgment on June 4, 2019.

This Court entered a Combined Order in this matter on December 16, 2019 in which it held that the PET LLC Agreement permits Defendants to initiate a "capital transaction" in the form of a merger with another LLC which they own. *Cianchette v. Cianchette*, No. BCD-CV-2019-42 (Bus. & Consumer Ct. Dec. 16, 2019, *Murphy, J.*) (order denying motion to dismiss or for a more definite statement). In particular, the Court stated that "Defendants' proposed valuation of PET, transfer of its assets (via sale or cash-out merger), and provision of cash distributions to its members qualifies as a capital transaction as defined by Section 4.4. of the PET LLC Agreement." *Id.* at 8. However, this Court continued that it "does not herein express any opinion about the *execution* of this procedure, nor as to any breach of duty by either party that could arise as part of the process." *Id.* Additionally, this Court denied Defendants' motion to dismiss because it concluded that Tucker had alleged the continuation of the same wrongful actions litigated in the

2016 Action, plus additional wrongful actions not litigated at that time, meaning res judicata does not apply. *Id.* at 8-10.

In March 2020, this Court declined to decide as a matter of law whether that capital transaction, or merger, was effective. *Cianchette v. Cianchette*, No. BCD-CV-2019-42 (Bus. & Consumer Ct. March 12, 2020, *Murphy, J.*) (order denying motion to strike and to establish effective date of capital transaction).

In June 2021, this Court addressed cross motions for summary judgment. It held there existed genuine issues of material fact as to the validity and enforceability of the merger between PET and Better Way Ford and that Defendants would not be entitled to summary judgment even if a merger was permissible under the LLC. It also held Peggy and Eric failed to establish a prima facie case for intentional infliction of emotional distress, that Tucker was not liable for defamation, and that Peggy and Eric had not sufficiently supported their counterclaims as to violations of 18 U.S.C. § 1836 and the Uniform Trade Secrets Act. *Cianchette v. Cianchette*, No. BCD-CV-2019-42 (Bus. & Consumer Ct. June 28, 2021, *Murphy, J.*) (order denying and granting cross motions for summary judgment).

FACTUAL ALLEGATIONS

The following facts, which are undisputed unless otherwise noted, have been drawn from Defendants Eric L. Cianchette, Peggy A. Cianchette, and PET, LLC's Statement of Material Facts, and Plaintiff Tucker J. Cianchette's Statement of Additional Material Facts. PET was formed in 2013 for the purpose of acquiring the assets of Casco Bay Ford and operating it as a car dealership with owner interests distributed between its Members, namely Tucker (33%), Peggy (33%), and Eric (34%). (Defs.' Supp'g S.M.F. ¶¶ 1-2.) The PET Operating Agreement (the "Operating

Agreement") was created by Defendant Peggy with the aid of the company's attorney. (Pl.'s Opp'g S.M.F. ¶ 1.) Peggy has been the Manager of PET since that entity's creation. (Opp'g S.M.F. ¶ 27.)

Tucker created the opportunity for PET to purchase the dealership through his relationship with Casco Bay Ford's previous owner, Art McLeod. (Pl.'s Opp'g S.M.F. ¶ 2; Defs.' Resp. to Opp'g S.M.F. ¶ 2.) Tucker brought his previous experience in the auto industry to PET. (Opp'g S.M.F. ¶ 3.) Eric provided the initial funding for the purchase of Casco Bay Ford, while Peggy brought neither funds nor experience. (Opp'g S.M.F. ¶ 4.) At the creation of PET, the parties intended for Tucker to eventually buy out Peggy and Eric by paying them what they had put in to purchase the dealership such that Tucker would remain the sole owner of PET and therefore of Casco Bay Ford. (Opp'g S.M.F. ¶ 5, 39; Defs.' Resp. S.M.F. ¶ 39.) However, when Tucker attempted in 2015 to purchase Defendants' interests in PET, they presented him with documents prepared by Tucker's brother, an attorney, such that should Tucker fail to purchase Peggy and Eric's interests he would forfeit his own interest in the dealership or otherwise end the negotiations. (Opp'g S.M.F. ¶ 6.) Eric knew and intended that Tucker's failure to purchase his and Peggy's interests would result in Tucker's loss of a nonrefundable $150,000 deposit and that such a loss would be financially painful. (Opp'g S.M.F. ¶ 8; Defs.' Resp. S.M.F. ¶ 8.) Eric and Peggy sought to end their business relationship with Tucker, citing a need to "move on" via a "business divorce." (Defs.' Resp. S.M.F. ¶ 10.)

Tucker filed suit against Defendants in 2016 (the "2016 Action") alleging, inter alia, that Peggy had caused PET to pay $65,000 per month in rent, double the alleged market rate; Peggy had improperly caused PET to make a $375,000 interest-free loan to Cianchette Family, LLC without PET's members' consent; Eric and Peggy had breached the PET LLC Agreement by causing their accountants to reduce Plaintiff's membership profits for 2014; and Eric and Peggy

4

had failed to close on the Membership P&S as defined in the Complaint. (Supp'g S.M.F. ¶ 4.) The jury in that case found, inter alia, that Eric and Peggy breached contracts with Tucker, that Eric and Peggy were liable to Tucker for claims of fraudulent misrepresentation and breach of the PET Operating Agreement, and that Peggy was liable to Tucker for breaching her duty of good faith and fair dealing as Manager of PET. (Opp'g S.M.F. ¶ 11.) Eric has stated the 2016 Action was a "farce" of a "kangaroo court" and Peggy believes that because the jury was "wrong," there was no need for her to change her conduct based on the jury's verdict. (Opp'g S.M.F. ¶ 12.) After the 2016 Action, Tucker had no power over decisions made at Casco Bay Ford, but his threats of litigation hindered Peggy's business decisions. (Opp'g S.M.F. ¶ 14; Defs.' Resp. S.M.F. ¶ 14.)

In 2019, following the payment of the judgment from the 2016 Action, Peggy and Eric desired to remove Tucker from PET and sever their business ties with him. (Opp'g S.M.F. ¶¶ 15-16; Defs.' Resp. S.M.F. ¶¶ 15-16.) As such, they turned to their attorneys to find a way to eliminate his ownership interest. (Opp'g S.M.F. ¶ 17.) The resulting plan was a structure for a merger (the "Merger") based on a valuation which calculated, after capital accounts are reconciled and repaid, that Tucker would be due nothing for his ownership interest. (Opp'g S.M.F. ¶¶ 18, 34.) The Merger was described as just a "paperwork exercise" and Peggy recognized that it would result in no consideration paid to PET, no liquidation of PET assets, a creation of a new entity which is effectively identical to PET, and that the only substantive change would be that Tucker is no longer a Member. (Opp'g S.M.F. ¶ 19.) Eric and Peggy have no interest in selling Casco Bay Ford and believe it will continue to generate them profit under their ownership. (Opp'g S.M.F. ¶¶ 21-22.) Tucker, Eric, and Peggy purchased the dealership through PET for approximately $5,300,000 in 2013. (Opp'g S.M.F. ¶ 44.) The current value of the dealership has been appraised at approximately $3,208,000, net of Member Loans and other debts. (Opp'g S.M.F. ¶ 43; Defs.'

Opp'g S.M.F. ¶ 43-44.) Peggy, as sole Manager of PET, never spoke to the individual responsible for valuation. (Opp'g S.M.F. ¶ 77.) Eric and Peggy stated they would not be willing to sell it even at the value set by the appraiser. (Opp'g S.M.F. ¶ 23, 45-46.)

From December 2013 through the beginning of 2016, Tucker served as General Manager of Casco Bay Ford. (Opp'g S.M.F. ¶ 26.) Wendy Ayotte was employed as the Executive Director of Operations. (Supp'g S.M.F. ¶ 18.) Eric attempted to fire Tucker as General Manager in early 2016, though he lacked the authority to do so. (Opp'g S.M.F. ¶ 28; Defs.' Resp. S.M.F. ¶ 28.) While Tucker was General Manager, Casco Bay Ford produced gross income for PET of $40,747,144 and $501,578,438 in 2014 and 2015, respectively, and net profits of $507,357 and $1,605,962 for the same. (Opp'g S.M.F. ¶ 29.) After Tucker exited his position in 2017, management duties were provided by ELC, Inc. ("ELC"), a company owned by Eric, which now also serves the role of Executive Director of Operations. (Defs.' Reply to Pl.'s Resp. S.M.F. ¶ 19; Supp'g S.M.F. ¶¶ 20-21.) PET paid ELC $250,000 in 2018 and $258,000 in 2019 as a management fee. (Supp'g S.M.F. ¶ 22.)

Michael Cianchette and Samuel Brown, employed by ELC, do not have physical offices at Casco Bay Ford. (Opp'g S.M.F. ¶ 59.) Brown considers himself to work for Casco Bay Ford. (Defs.' Resp. S.M.F. ¶ 69.) Michael Cianchette stops by the dealership three or four times a week for roughly twenty minutes per visit and Brown visits the dealership most Tuesdays and a few times at year end to meet with accountants. (Opp'g S.M.F. ¶¶ 60-61.) ELC pays Michael Cianchette a salary of approximately $150,000 and Brown a salary of approximately $140,000. (Defs.' Resp. S.M.F. ¶ 62.) PET has never paid, allocated, or expensed any amount of compensation to the dealer-principal. (Supp'g S.M.F. ¶ 27.)

After Tucker departed and ELC, represented by Michael Cianchette, took over management duties, gross income was $52,346,355 and $55,228,839 in 2016 and 2017, respectively, with net profits of $346,300 and $42,925 for the same. (Opp'g S.M.F. ¶ 32.) Despite the 96.7% drop in net profit from Tucker's final year as General Manager and Michael's first full year in control in 2017, Peggy did not consider replacing Michael in his management role. (Opp'g S.M.F. ¶ 33.) She does not believe these years of poor performance are a fair representation of the dealership's earning potential. (Opp'g S.M.F. ¶ 47.)

Peggy understands that it is her responsibility to calculate and issue annual distributions as required by section 4.1.2 of the LLC Operating Agreement. (Opp'g S.M.F. ¶ 78.) She did not do an analysis of whether there should be an annual distribution of cash flow but rather handed the task over to the accountants. (Opp'g S.M.F. ¶ 79; Defs.' Resp. S.M.F. ¶ 79.) In 2019, cash flow was at least equal to the $831,000 company net profit. (Opp'g S.M.F. ¶ 80; Defs.' S.M.F. ¶ 80.)

For the year 2016, Peggy established a reserve of $100,000 which she now agrees was not necessary. (Opp'g S.M.F. ¶ 82.)

As originally constructed and presented to this Court, Peggy and Eric planned to have the Merger effective as of September 30, 2019. (Opp'g S.M.F. ¶ 35.) In 2019, PET's gross income was $59,797,481 and its net profit was $717,595, representing a 1,339% increase over the net profit in 2018, and in 2020, after Tucker's planned exit, PET's gross income and net profit again increased to $59,519,876 and $1,439,528, respectively. (Opp'g S.M.F. ¶¶ 36-37.) Per the Merger structure, these profits and any appreciation of value of the business belong solely to Peggy and Eric, not Tucker. (Opp'g S.M.F. ¶ 38.) Nevertheless, Peggy stated she believes the Merger was in Tucker's best interest. (Opp'g S.M.F. ¶ 40.) Eric stated he wants nothing to do with Tucker and that he does not care what happens to him. (Opp'g S.M.F. ¶ 41.)

7

Plaintiff designated Wendy Ayotte, Corey Vargo, and Steve Hewitt as experts to testify about alleged "errors and inconsistencies" between PET's business records and the trial balances which emerged from the 2016 Action. (Supp'g S.M.F. ¶ 7.) Ayotte was retained to look for discrepancies in PET's financial statements as compared to what she saw when employed by PET but does not otherwise hold expert opinions. (Supp'g S.M.F. ¶ 8.) Vargo holds the opinion that errors were made in the reporting of capital account income and expense allocation. (Supp'g S.M.F. ¶ 9.) Hewitt will offer his opinion as to PET's financial performance compared to industry averages. (Supp'g S.M.F. ¶10.) In Tucker's Affidavit, he states "substantial payments" were made to certain insiders and names ten areas of payment. (Supp'g S.M.F. ¶ 11.)

Defendants retained BerryDunn on or about June 23, 2018 to analyze and provide opinions as to fair market rent for Casco Bay Ford, appropriate management fees, and appropriate working capital levels and capital reserves (the "BerryDunn Opinion). (Supp'g S.M.F. ¶13.) BerryDunn recommended that PET pay a yearly management fee of $258,000. (Supp'g S.M.F. ¶17.) Tucker believes the BerryDunn Opinion is unfair and offers competing evidence from his experts, Mark Filler, Mark Plourde, and Steve Hewitt. (Pl.'s Resp. S.M.F. ¶ 15.) Tucker has not spoken to any representative of BerryDunn nor does he have knowledge of conversations between BerryDunn and Defendants or their counsel. (Supp'g S.M.F. ¶ 16.)

PET rented the Casco Bay Ford premises from its landlord, Cianchette Family, LLC, and the lease between these entities (the "Lease") described the premises as containing 16,180 square feet. (Supp'g S.M.F. ¶ 28.) By its terms, the Lease expired on January 1, 2019 and PET exercised its renewal option, which renewed the Lease on the same terms and conditions "except for current market rent conditions." (Supp'g S.M.F. ¶¶ 29-31.) Tucker was willing to discuss allowing a third party to analyze such conditions to determine the new rent. (Supp'g S.M.F. ¶ 32.) In the BerryDunn

8

Opinion, BerryDunn concluded that the fair market rent for the property was $687,900 per year. (Supp'g S.M.F. ¶ 33.)

After the 2016 Action and prior to April 3, 2020, Cianchette Family, LLC, the landlord under the Lease, directed all rent due pursuant to the Lease to be paid to Top of Exchange, LLC ("Top of Exchange.") (Supp'g S.M.F. ¶¶ 49-50.) Part of the damages awarded to Tucker in the 2016 Action included compensation for his claim Peggy had caused PET to pay $65,000 per month in rent alone, which is in excess of the face amount required by the Lease. (Supp'g S.M.F. ¶ 73.) The verdict did not specify whether these damages included sums for breach of fiduciary duty related to rent payments beyond February 2018. (Resp. S.M.F. ¶ 73; Defs.' Obj. ¶ 73.) After the 2016 Action, PET continues to pay $65,000 per month. (Pl.'s Resp. S.M.F. ¶ 74; Opp'g S.M.F. ¶¶ 55-56.) The parties dispute whether this payment represents rent alone or both rent due to Top of Exchange and management fees due to ELC. (Supp'g S.M.F.¶¶ 50; Pl.'s Resp. S.M.F. ¶¶ 49-50; Opp'g S.M.F. ¶¶ 55-56; Defs.' Resp. S.M.F. ¶¶ 55-56.)

On January 1, 2017 PET executed and delivered a Promissory Note to Peggy and Eric in the original principal amount of $1,121,233 (the "2017 Member Loan"). (Supp'g S.M.F. ¶ 37.) Pursuant to this Note, Defendants Peggy and Eric had the right to receive interest but prior to the 2016 Action interest had not accrued or been paid on any Member Loans because Defendants Peggy and Eric had agreed to forego charging interest in return for increased rent payments. (Supp'g S.M.F. ¶ 38.) After Plaintiff successfully argued in the 2016 Action that Peggy had breached her fiduciary duty by paying $65,000 per month in rent, Peggy and Eric wished to accrue and receive interest on Member Loans. (Supp'g S.M.F. ¶ 39; Resp. S.M.F. ¶ 39.) The BerryDunn Opinion as to interest is limited to recommendations about interest on loans made after January 2019 and expresses no opinion on interest on prior loans. (Supp'g S.M.F. ¶ 36.)

9

Advertising decisions at Casco Bay Ford are primarily made by John Litwinetz, the General Sales Manager, in consultation with the Creative Broadcast Company, seeking to maximize profitability. (Supp'g S.M.F. ¶ 40.) Litwinetz meets with Samuel Brown, ELC's Chief Financial Officer, during the budgeting process to review advertising expenditures and to draw a budget for the upcoming year. (Supp'g S.M.F. ¶ 41.) Neither Litwinetz nor Brown are related to the Cianchette family. (Supp'g S.M.F. ¶ 42.)

PET pays Erik's Church, a country music bar owned by Peggy and Eric's son Kenneth Cianchette, $2,000 per month to be a stage sponsor. (Supp'g S.M.F. ¶ 43.) Casco Bay Ford does not have any similar sponsorship arrangements with other businesses. (Opp'g S.M.F. ¶ 86.) Kenneth Cianchette approached Litwinetz about this arrangement and based the value of the sponsorship on a similar package established by radio station 99.9 The Wolf. (Supp'g S.M.F. ¶ 44.) Casco Bay Ford cannot reliably state how many customers have been generated by this sponsorship or determine its financial value to the dealership. (Opp'g S.M.F. ¶ 85.) Peggy was not involved in the sponsorship negotiations. (Supp'g S.M.F. ¶ 46.) Peggy did loan Erik's Church approximately $350,000-$400,000, per Kenneth's memory. (Opp'g S.M.F. ¶ 83.)[2]

Casco Bay Ford's office manager is Roberta Solerno, who has review authority over all checks written by PET. (Supp'g S.M.F. ¶ 53.) Virtually every check written by PET is backed up by an invoice or other record. (Supp'g S.M.F. ¶ 54; Opp'g S.M.F. ¶ 66.) Solerno has never seen an invoice from ELC that she believed was questionable. (Supp'g S.M.F. ¶ 55.) Solerno does not ask any questions about the purpose of checks when asked to write them by the dealership's owners. (Opp'g S.M.F. ¶ 67.)

---

[2] The cited opposing statement of material facts incorrectly references Defendants' Statement of Material Facts Exhibit O as support; the proper citation is Exhibit P to the same.

Jack Rayers is Peggy and Eric's son-in-law and worked for ELC and provided IT services to Casco Bay Ford. (Supp'g S.M.F. ¶¶ 56-57.) Rayers almost exclusively performed IT services for Casco Bay Ford, but still tracked his time and reported it to ELC, which would in turn invoice Casco Bay Ford at Rayers' hourly rate. (Supp'g S.M.F. ¶ 58.) The BerryDunn Opinion states that a non-employee who serves as both IT systems manager and website manager should be paid $81,000 per annum and that the amount paid as a management fee should be increased by this amount if the services were provided through a management agreement. (Supp'g S.M.F. ¶ 59.)

Many car dealers have switched from using a manufacturer warranty program, i.e., a quotes retro program, to creating their own insurance companies, i.e., reinsurance companies. (Opp'g S.M.F. ¶ 68.) In a reinsurance program, a company forms another company which insures the products the first company sells, such as extended service plans in the case of car dealerships. (Opp'g S.M.F. ¶ 70.) In September 2018 Brown asked Casco Bay Ford's accountants for information about contacts through which the dealership might form a reinsurance program and was given the name of Bob Hunter. (Opp'g S.M.F. ¶ 69.) Through Hunter, Casco Bay Ford set up reinsurance "risk pools" which are transferred to a separate company owned by Peggy and Eric. (Opp'g S.M.F. ¶ 71.) Casco Bay Ford has no formal connection to any reinsurance company and the financial activity of the company participating in the reinsurance pool does not run through Casco Bay Ford. (Supp'g S.M.F. ¶ 62.) From December 2017 to May 2020, Casco Bay Ford made payments on extended warranty contracts to reinsurance companies owned by Hunter or Peggy and Eric of $670,622.91. (Opp'g S.M.F. ¶ 72.)

Casco Bay Ford operates a commercial truck facility in Freeport, Maine on land owned by CF Cousins River, LLC, a real estate holding company owned by Eric and Tucker's siblings. (Supp'g S.M.F. ¶ 63; Opp'g S.M.F. ¶ 74.) Michael Cianchette kept no records of his calculations

of the expected profitability of the facility. (Opp'g S.M.F. ¶ 76; Defs.' S.M.F. ¶ 76.) No rent was paid in connection with this truck center until 2021, after PET had merged with Better Way Ford, LLC ("Better Way Ford"). (Supp'g S.M.F. ¶ 65.) During the 2016 Action, Tucker argued that Peggy breached her fiduciary duties by causing PET to make a loan to CF Cousins River (the "CF Loan") while at the same time she and Defendant Eric had a $1.1 million promissory note from Casco Bay Ford paying them 4.5% interest. (Supp'g S.M.F. ¶ 66; Defs.' Obj. ¶ 66.) The court in the 2016 Action agreed that the interest rate Peggy and Eric were entitled to receive on their loans should be imputed to the CF Loan. (Supp'g S.M.F. ¶ 67.) Tucker's claims in the instant action related to the CF Loan include, at a minimum, that the loan has not been repaid. (Supp'g S.M.F. ¶ 75.) In the 2016 Action, Tucker did not request any equitable remedy related to the CF Loan following the return of the jury verdict. (Supp'g S.M.F. ¶ 76.)

Since December 9, 2013, when PET acquired the assets of Casco Bay Ford, PET's balance sheet has reflected a loan from Peggy and Eric to PET in the amount of $1,769,579 (the "2013 Member Loan"). (Supp'g S.M.F. ¶ 68.) Tucker communicated with his attorney and accountant regarding the treatment of the 2013 Member Loan prior to the execution and delivery of the Membership P&S. (Supp'g S.M.F. ¶ 69.) Though this loan was defined as a Loan in the Membership P&S, it was the intent of the Members to convert, at closing, the loan to equity and therefore charge no interest. (Supp'g S.M.F. ¶ 70; Resp. S.M.F. ¶¶ 70-71.)

During the 2016 Action, the court entered judgment in favor of Defendants on issues relating to the allegedly disproportionate allocation on income and profit to Tucker in 2014 because Tucker agreed he had presented no evidence to substantiate his claims. (Supp'g S.M.F. ¶ 72.)

Tucker has designated Mark Filler as an expert on diminution in value damages and Filler will provide his opinion as to the valuation of PET on a "fair value basis." (Supp'g S.M.F. ¶ 77.) Filler's opinion includes testimony about potential valuation and profits in the absence of the merger. (Supp'g S.M.F. ¶ 78; Resp. S.M.F. ¶ 78.)

Peggy asserts she has no ill will towards Plaintiff, believes it was in the best interests of all Members of PET to end their business relationship, wants to pay him his fair share of the Merger and that the Merger was not executed with the intent to harm him. (Supp'g S.M.F. ¶ 80.) Tucker has contributed virtually no cash to PET while Eric has contributed several million dollars, though Tucker did bring Defendants the opportunity to purchase Casco Bay Ford in the first place and achieved record profits while serving as General Manager and Dealer Principle between 2013 and 2016. (Supp'g S.M.F. ¶ 82; Resp. S.M.F. ¶ 82.) Tucker received more than $700,000 in distributions from PET between 2014 and 2019 but did not receive a distribution in 2019. (Supp'g S.M.F. ¶ 83; Opp'g S.M.F. ¶ 81.)[3]

Tucker's Complaint in the instant action includes, at a minimum, claims and causes of action based on (i) the reasons why the Merger of PET into Better Way Ford was unfair to him; (ii) that any vote by Peggy and Eric as Members to proceed with the Merger would be a breach of their duties to him; and (iii) that the Merger could only be authorized at a formal meeting of the Members. (Supp'g S.M.F. ¶ 79.)

DISCUSSION

## I.    Defendants' Motion to Exclude

---

[3] Plaintiff's opposing statement of material fact cites the Tucker Affidavit for support incorrectly as Exhibit M; it is located at Exhibit G.

Defendants move to exclude the testimony of Tucker's expert Mark Plourde, who was deposed on the subject of market rent for the property at which Casco Bay Ford operates. Tucker holds this opinion out as relevant because of the significant factual issues in this case relating to the proper valuation of PET and of the real estate Casco Bay Ford is located on. Expert testimony may be offered where it is relevant under the Maine Rules of Evidence, *Searles v. Fleetwood Homes of Penn., Inc.*, 2005 ME 94, ¶ 21, 878 A.2d 509, meaning where it both has "any tendency to make a fact more or less probable" and "is of consequence in determining the action." M.R. Evid. 401.

Defendants argue that there are only three dates related to the fair market rent of the dealership which are relevant to any of Tucker's claims: (i) January 1, 2019; (ii) September 30, 2019; and (iii) April 3, 2020, and that Plourde's opinion only pertains to fair market rent on August 13, 2020, rendering it irrelevant and thus inadmissible under Rule 401. January 1, 2019 is the date upon which the first five-year term of the lease between PET, as tenant, and Cianchette Family, LLC, as landlord, ended. PET had the right to renew for a second five-year term on the same terms as the first lease except for current market rent conditions, which it did. September 30, 2019 is the date which the Plan of Merger between PET and Better Way Ford indicated as the date upon which PET was to be valued. April 3, 2020 is the date upon which the Plan of Merger was filed with the Maine Secretary of State and the date upon which Defendants contend the Merger was effective.

Plourde testified at his deposition that his opinion pertained only to August 13, 2020. (Plourde Dep. 97-98.) Defendants argue it cannot be relevant for any pre-COVID-19 dates or April 3, 2020 because of the economic uncertainty and turmoil which resulted from the pandemic in the spring of 2020. However, Plourde's opinion is based in part on an earlier, pre-COVID appraisal.

Additionally, it could tend to make it more probable that Tucker's allegation about rent overpayment is true, depending on credibility determinations made a factfinder.

Defendants' arguments as to the role the COVID-19 pandemic may have played in causing economic uncertainty and thereby affecting Plourde's ability to accurately appraise the fair market rent are not persuasive as a basis for exclusion of his testimony; it is the role of the factfinder to determine whether his opinion is credible given this uncertainty. Evidence will only be excluded under Rule 401 where it lacks *any tendency* to prove or disprove a fact; mere attenuation of that tendency is insufficient for exclusion.

## II.     **Defendants' Motion for Judgment on the Pleadings**

Defendants move for judgment in their favor on Count IV (Civil Conspiracy) and in Eric's favor on Count IX (Punitive Damages) under Rule 12(c) of the Maine Rules of Civil Procedure. Rule 12(c) permits any party to move for judgment on the pleadings after pleadings are closed so long as the motion does not delay the trial. For the purposes of this motion, the Court assumes the factual allegations in the Plaintiff's Complaint are true and determines, viewing the Complaint in the light most favorable to the Plaintiff, whether it alleges a cause of action entitling the Plaintiff to relief on any legal theory. *See Cunningham v. Haza*, 538 A.2d 265, 267 (Me. 1988).

### A.  Count IV

Tucker alleges in Count IV, a claim for civil conspiracy, the following, in addition to repeating and realleging the prior paragraphs:

> 48. Eric and Peggy, personally and through individuals and entities they directed and controlled, developed a common plan or design to engage in tortious acts, including but not limited to depriving Tucker of the fair value of his ownership interest in PET.

15

49. As a result of Eric and Peggy's concerted conduct and planning, the tortious acts of each are legally attributable to the other. Thus Eric and Peggy are vicariously liable for the other's tortious acts, including but not limited to breach of fiduciary duty.

(Pl.'s Compl. ¶¶ 48-49.) In *Meridian Medical Systems, LLC v. Epix Therapeutics, Inc.*, issued after the filing of the instant Complaint, the Law Court explains that "under Maine law, there is no tort for 'conspiracy.'" 2021 ME 24, ¶ 10, 250 A.3d 122. Civil liability stems only from the commission of an independent tort and though a party may additionally be liable for conspiracy in connection with that tort, conspiracy cannot stand alone. *See Cohen v. Bowdoin*, 288 A.2d 106, 110 (Me. 1972.) On the face of the Complaint, Tucker has not alleged an independent tort.

Tucker did not move to amend the Complaint, timely or otherwise, in light of *Meridian*'s clear statement on a plaintiff's inability to state a claim for conspiracy as an independent tort. Instead, Tucker attempts to re-characterize Count IV as based on a claim of aiding and abetting, namely Eric's assistance in Peggy's alleged breach of fiduciary duty, via the totality of the preceding allegations as incorporated into this Count. However, *Meridian* also states that not only does notice pleading require factual allegations meeting each element of a claim, a plaintiff stating a claim for aiding and abetting "must allege with specificity that the defendant had actual knowledge that the principal tortfeasor was committing a breach of fiduciary duty and that the defendant performed substantial acts to assist in the commission of that tort." 2021 ME 24, ¶ 28, 250 A.3d 122. In oral arguments, counsel pointed to paragraphs nine through fifteen of the Complaint as stating, "on information and belief," that Eric and Peggy worked together, that they conspired together, and that Peggy acted with Eric's assistance and direction. (Pl.'s Compl. ¶¶ 9-15.) Neither in these paragraphs nor elsewhere in the Complaint does he plead with specificity that Eric had actual knowledge Peggy was committing a breach of fiduciary duties. These vague,

conclusory allegations are insufficient to support a claim for aiding and abetting and Count IV fails as a matter of law.

## B. Count IX

Count IX seeks punitive damages against Eric and Peggy. However, because Count IV is the only tort count against Eric and this Court finds it fails, Count IX must fail as to Eric as well. Tucker asserts that outside of punitive damages for a tort, Eric is also subject to punitive damages for his own breach of an implied fiduciary duty. The Maine LLC Act states that "a member not involved in the management of a limited liability company does not have a fiduciary duty to the limited liability company, or to any other member, or to another person that is a party to or is otherwise bound by a limited liability company agreement, solely by reason of being a member." 31 M.R.S. 1559(3). This statute is subject to section 1521, subsection 3, paragraph A, which provides that to the extent a member or other person in an LLC has fiduciary duties, those duties may be modified or eliminated in a written LLC agreement, save that the implied contractual covenant of good faith and fair dealing may not be eliminated. 31 M.R.S. § 1521(3)(A). The covenant of good faith and fair dealing sounds in contract, not in tort, so it does not create fiduciary duties and damages must be pursued as part of a breach of contract claim. *See Nisbet v. Harp Invs.*, 2018 Me. Super. LEXIS 89, *9 (Me. Bus. & Consumer Ct. Dec. 4, 2018). The PET LLC Agreement does not impose fiduciary duties on non-Manager members, so the default rule applies, and Eric has no implied fiduciary duty to breach.

## III. **Defendants' Motion for Summary Judgment**

### A. Standard of Review

Summary judgment is appropriate where the parties' statements of material fact and the portions of the record referenced therein "disclose no genuine issues of material fact and reveal that one party is entitled to judgment as a matter of law." *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 11, 915 A.2d 400. "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact finder to choose between competing versions of the fact." *Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774 (quoting *Stewart-Dore v. Webber Hosp. Ass'n*, 2011 ME 26, ¶ 8, 13 A.3d 773). The Court must view a party's statements of material fact in the light most favorable to the non-movant and draw all reasonable inferences in favor of the same. *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 21, 969 A.2d 897. However, a party may not "rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence . . . of a fact." *Kenny v. Dep't of Human Servs.*, 1999 ME 158, ¶ 3, 740 A.2d 560. A party who moves for summary judgment is entitled to judgment only if the party opposed to the motion, in response, fails to submit "enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." *Lougee Conservancy*, 2012 ME 103, ¶ 12, 48 A.3d 774.

Limited liability companies are governed by the Maine Limited Liability Company Act (the "LLC Act"). 31 M.R.S. §§ 1501-1693. Under § 1507 of the LLC Act, "principles of freedom of contract and. . . the enforceability of limited liability company agreements" are given primary consideration. Under § 1521(3), duties owed by members and other persons, such as fiduciary and contractual duties, may be "expanded or restricted or eliminated" by the LLC agreement save for the "implied contractual covenant of good faith and fair dealing," which cannot be eliminated.

B. Analysis

18

Plaintiff Tucker Cianchette asserts claims both against Defendant Peggy Cianchette in her capacity as Manager of PET and against Defendants Peggy and Eric Cianchette in their capacities as Members of PET. In Count I, Tucker asserts Peggy and Eric breached the PET LLC Agreement and the covenant of good faith and fair dealing; in Count II, that Peggy breached her fiduciary duties as manager of PET; and in Count III, that Peggy and Eric are liable for a loss in income and a loss in value of the enterprise. Further, Tucker also asserts claims in Count V that he is entitled to a declaratory judgment that Peggy's allegedly self-dealing actions undertaken in violation of the PET Agreement are void; in Count VI, that Peggy and Eric should be dissociated from PET under 31 M.R.S. § 1582 and penalized under § 1583; in Count VII, that this Court should appoint a receiver to manage PET; in Count VIII, for injunctive relief; and in Count IX, for punitive damages.

Preliminarily, this Court must address whether res judicata bars any issues, whether the validity of the Merger is subject to the instant Complaint, and whether the business judgment rule shields Peggy from Tucker's allegations.

The doctrine of res judicata consists of two concepts: issue preclusion and claim preclusion. *Pearson v. Wendell*, 2015 ME 136, ¶ 23, 12S A.3d 1149. While issue preclusion, or collateral estoppel, prevents the re-litigation of factual issues already decided in a prior case, claim preclusion prevents the litigation of claims that were, or could have been, litigated in a prior case. *Town of Mt. Vernon v. Landherr*, 2018 ME 105, ¶ 15, 190 A.3d 249; *Portland Water Dist. v. Town of Standish*, 2008 ME 23, ¶ 8, 940 A.2d 1097. To determine whether a claim raised in a subsequent action is barred by claim preclusion, Maine utilizes a transaction test whereby the Court examines "the aggregate of connected operative facts that can be handled together for purposes of trial to determine if they were founded upon the same transaction, arose out of the same nucleus of

operative facts, and ought redress for essentially the same basic wrong." *Portland Water Dist.*, 2008 ME 23, ¶ 8, 940 A.2d 1097.

Defendants assert summary judgment should be granted, on the basis of res judicata, in their favor on any claims premised on issues or claims involved in the 2016 Action. There is no dispute that Tucker and the Defendants were both parties to the 2016 Action. Peggy and Eric argue that claims "premised on re-characterizing the Member Loans as equity" should be subject to summary judgment due to judicial estoppel. (Defs.' Mot. 27.) In the 2016 Action, Tucker argued that taking an interest-free loan violates the LLC Agreement requirement that insider transactions be at arms-length and commercially reasonable. (Opp'g S.M.F. ¶ 66.) In that case, at issue was the proper interest rate for determining damages for Defendants' failure to charge interest on the CF Loan, not whether the loan itself was appropriate. Here, Tucker's claims relate to his allegations that Peggy and Eric are attempting to circumvent the prohibition on payment of interest on PET Capital Contributions under sections 3.3 and 3.5 of the LLC Agreement by substituting an interest-bearing promissory note for their capital contributions. Tucker alleges this is relevant to the valuation methodology used by PET and its expert witnesses, which relates to the validity of the execution of the Merger. The current characterization of the Member Loans is thus a question of fact relevant to the issues in the instant action and is not barred by res judicata.

As to claims relating to the CF Loan and excessive rent, Tucker alleges that PET has continued its wrongful acts as held in the verdict of the 2016 Action. Defendants counter that the monthly "rent" payments, though nominally the same amount as before, now include both rent and management fees and therefore rent has been reduced. Whether this is true is an issue of fact, as is whether Defendants have continued the wrongful acts related to the CF Loan for which they were

20

held liable in the 2016 Action. Res judicata cannot as a matter of law shield Peggy and Eric from allegations of continued wrongful conduct since the previous suit.

The Defendants also question whether Tucker's Complaint states a claim related to the Merger, which had not occurred at the time the Complaint was filed. However, the Complaint does explicitly reference the then-proposed "capital transaction" whereby Peggy and Eric would "withdraw their capital from [PET]" in paragraphs thirty-three through thirty-five as one of the alleged wrongful acts in regard to capital contributions. Tucker alleges Peggy and Eric planned to merge PET with one of Eric's companies in order to terminate his ownership interest in Casco Bay Ford. New events which occur after a complaint is filed but which fall under claims already pleaded should be considered as part of the complaint. *See Napp v. Parks*, 2007 ME 126, ¶ 22, 932 A.2d 531. Peggy and Eric ultimately did precisely what Tucker alleged they planned to do in his initial Complaint and thus the execution of that "capital transaction" is part of this case. In its June 2021 Combined Order, this Court declined to grant summary judgment on the validity of the execution of that merger. *Cianchette*, No. BCD-CV-2019-42 (Bus. & Consumer Ct. June 28, 2021, *Murphy, J.*). Questions of fact remain as to Peggy and Eric's motives for pursuing the Merger, the valuation of PET, the reasonableness of the transaction, the distribution calculation, and the value of Tucker's ownership interest. Defendants argue that the capital transaction process through which the Merger was carried out is formulaic under the PET Operating Agreement, but they were the ones who supplied the figures for that formula and Tucker brings evidence challenging the accuracy of their valuation.

As for the application of the business judgment rule, differing "business philosophies" among LLC members do not rise to the level of a breach of fiduciary duty and business decisions are protected from judicial review unless any "allegedly harmful conduct was primarily motivated

21

by fraud or bad faith." *Meridian v. Med. Sys., LLC v. Epix Therapeutics, Inc.*, 2021 ME 24, ¶ 37, 250 A.3d 122 (quoting *Rosenthal v. Rosenthal*, 543 A.2d 348, 353 (Me. 1988)). This protection only exists absent a showing of "sufficient" bad faith, which could be demonstrated by a breach of fiduciary duty. *Id.* The plaintiff must allege facts allowing the court to find such bad faith; conclusory assertions are insufficient. *Sunspray Condo Ass'n*, 2013 ME 19, ¶¶ 15-16, 61 A.3d 1249.

Because the LLC Agreement does not provide for the duties of Members to one another, the LLC Act defines these duties. 31 M.R.S. § 1512(2). Under § 1512(4), Members are not liable to each other if they relied in good faith on the LLC Agreement, and under § 1559(2), a Member cannot "be held personally liable for money damages for failure to discharge any duty unless the member. . . is found not to have acted honestly or in the reasonable belief that the action was in or not opposed to the best interests of the limited liability company or its members." Relatedly, under Maine law, LLC members owe a duty of good faith and fair dealing to each other which cannot be eliminated in the LLC agreement. 31 M.R.S. § 1521(3)(A).

Tucker has alleged numerous facts which could support a finding of a breach of fiduciary duty or otherwise supporting an inference of bad faith. As such, the business judgment rule, assuming arguendo *Meridian*'s implication that it applies to LLC members is accurate, does not as a matter of law prevent claims based upon Peggy's actions as Manager or her and Eric's actions as LLC Members from proceeding to trial.

1. Counts I & II

Section 5.4.3 of the PET LLC Agreement requires each Member to understand and acknowledge that "the conduct of the Company's business may involve business dealings and

undertakings with Members and their Affiliates. In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms." Section 5.4.1 of the same renders Peggy, as Manager, liable for any acts undertaken fraudulently, in bad faith, or which constitute gross negligence.

Tucker challenges numerous transactions and dealings by PET with Peggy and Eric, their companies, and their family members. Per the PET LLC Agreement, such transactions are required to be at arm's length and at commercially reasonable terms. For example, the jury in the 2016 Action found that the interest-free loan taken from PET by Peggy for the benefit of Eric and Tucker's siblings was a breach of her fiduciary duty, *Cianchette*, 2019 ME 87, ¶ 37, 209 A.3d 745, but Peggy has testified that the loan is still outstanding, and no interest is being charged. Tucker alleges Peggy and Eric have re-booked over a million dollars of their capital accounts as loans so that they can claim $150,890 in interest owed to them before Tucker is entitled to any compensation for his share of PET. The 2016 Action also found that Peggy and Eric breached their fiduciary duties by causing PET to pay excessive rent to their own real estate company, in the amount of $65,000 per month. The parties agree that PET continues to pay their company $65,000 per month in rent but dispute whether that amount is still purely for rent or also includes management fees. Also, Casco Bay Ford developed a commercial truck facility in Freeport on land owned by a real estate holding company owned by Eric and Tucker's siblings. This new facility may have generated additional profits affecting Casco Bay Ford's valuation, but its profitability has not been tracked and has not been factored into the business's valuation, which could have affected Tucker's compensation for his share of PET.

Management fees are also a subject of contention, as PET has, since 2017, paid Eric's company ELC more than $250,000 per year for management services carried out by Peggy and

Eric's son Michael and by Samuel Brown, neither of whom have an office at Casco Bay Ford and neither of whom spends more than a few hours a week on site. The fee paid to ELC for these management services is twice the salary paid to Tucker for what he alleges were the same responsibilities as full-time, on-site General Manager. Casco Bay Ford has also paid ELC other sums whose purpose remains unclear, totaling $789,076.04 between December 2017 and April 2020.

In September 2018 Sam Brown of ELC sought recommendations from Casco Bay Ford's accountants about contacts for forming a reinsurance company which would provide a warranty program for the dealership's vehicles, enabling PET's Members to pay themselves the insurance premiums instead of sending them to the manufacturer. Brown was given the contact information of Bob Hunter. Hunter then set up reinsurance risk pools with Casco Bay Ford whose ownership was transferred to a separate company owned by Peggy and Eric. Casco Bay Ford makes payments to Hunter's companies or Peggy and Eric's company for its extended warranty contracts. It is a question of fact as to whether this violates the PET LLC Agreement.

Additionally, under section 4.1.2 of the PET LLC Agreement, cash flow for each taxable year must be distributed to interest holders no more than seventy-five days after year end. It was Peggy's responsibility as Manager to calculate and issue these distributions, but she did not do so at least in 2019 and Tucker did not receive a distribution in 2019.

Lastly, Casco Bay Ford pays Erik's Church, a restaurant owned by Peggy and Eric's son Kenneth, $2,000 per month as a sponsorship fee. The dealership does not have a similar arrangement with any other business and has no metrics about whether or how many customers have been generated by this form of advertising. Because Kenneth is their son, this is an insider transaction subject to the relevant provisions of the PET LLC Agreement.

24

Whether any or all of the above dealings meet the criteria of being arms-length transactions carried out on commercially reasonable terms and/or are violations of the LLC Operating Agreement are questions of fact which this Court cannot decide on summary judgment.

Moreover, under § 1522(2) of the LLC Act, "[n]otwithstanding any contrary provision of law, there exists an implied contractual covenant of good faith and fair dealing in every limited liability company agreement." Peggy, Eric, and Tucker are all bound by this covenant implied by the LLC Agreement. At the time PET was formed, it was the intention of all parties for Eric to fund the purchase of Casco Bay Ford and for Tucker to later buy him out, thereby becoming the sole owner of PET and of the dealership. On August 9, 2019 Peggy and Eric informed Tucker of their plans for a "capital transaction," i.e., the Merger, whereby PET would merge with another of Eric's companies, Better Way Ford, resulting in the termination of Tucker's ownership interest. Tucker claims this Merger is a breach of Peggy and Eric's covenant of good faith and fair dealing because, he alleges, it was intentionally structured so as to eliminate his interest, contrary to the common purpose and justified expectations of the parties at the time the LLC Agreement was signed. Whether their actions constitute a breach of the covenant is a question for a jury. *Marquis v. Farm Family Mut. Ins. Co.*, 628 A.2d 644 (Me. 1993).

And as the Law Court has already explained, Peggy, as Manager of PET, owed and continues to owe fiduciary duties to the LLC Members, and a failure to act in good faith towards those Members would constitute a breach of these duties. *Cianchette*, 2019 ME 87, ¶ 37, 209 A.3d 745. Tucker alleges Peggy has not ceased the conduct already held to be a breach of her fiduciary duties, which is a cause of action independent of whether that conduct constitutes a breach of the Operating Agreement. *Id.* A factfinder must determine whether Peggy has continued her wrongful conduct.

25

2. Count III

Under Section 5.4.1 of the PET LLC Agreement, Peggy, as Manager, "shall not be liable, responsible, or accountable in damages or otherwise to the Company or to any Member for any action taken or any failure to act on behalf of the Company within the scope of the authority conferred on the Managers by this Agreement or by law, unless the action was taken or omission was made fraudulently or in bad faith or unless the action or omission constituted gross negligence." Her liability is limited, but not eliminated, by this LLC Agreement.

After Peggy fired Tucker as General Manager, the net profit of PET dropped by 97% under the management of Casco Bay Ford by ELC, Eric's management company, but Peggy did not consider making any changes to the management structure nor does she recall taking any other actions to improve profitability at the time. Tucker alleges these acts constitute gross negligence.

In 2013, Eric, Peggy, and Tucker purchased Casco Bay Ford, through PET, for $5.3 million. The current appraised value of the dealership is more than two million dollars less, at $3,208,000, a figure affected by the poor performance after Tucker's departure as General Manager. Defendants assert this is reasonable because the valuation is net of the loans they made to the company. It is a question of fact as to whether this valuation is accurate. Eric has stated he would not sell the dealership for its appraised value, or at any price. He and Peggy have testified that they believe the business has actually improved since they purchased it in 2013, yet they submit evidence that it is worth less. Peggy has stated that she does not believe the poor performance in 2017 and 2018 are not a fair representation of the dealership's profit potential. Tucker alleges it was a breach of Peggy and Eric's fiduciary duties to hold out this valuation opinion as fair in light of its use as a metric for valuing Tucker's own interest at $0.

3.  Counts V-IX

The remaining counts of Tucker's complaint seek the specific remedies of declaratory judgment, disassociation, appointment of a receiver, injunctive relief, and punitive damages as to Peggy Cianchette. These remedies are based on continued and new wrongful conduct supported by properly alleged facts as detailed above. In particular, punitive damages are available to a plaintiff who proves "by clear and convincing evidence that the defendant acted with either express or implied malice." *Tuttle v. Raymond*, 494 A.2d 1353, 1363-64 (Me. 1985). Whether a defendant's conduct was motivated by actual ill will or could by its nature be inferred to be spurred by malice is a question of fact. *Waxler v. Waxler*, 1997 ME 190, ¶ 15, 699 A.2d 1161. Tucker alleges that Peggy's actions in the preceding counts were undertaken with express or implied malice towards him. Peggy has stated she bears him no ill will but Tucker points to her alleged continuation of conduct already found in the 2016 Action to be a breach of fiduciary duty as indicating that statement not to be credible. Moreover, because Tucker is seeking punitive damages for *continued* wrongful conduct since the 2016 Action, the fact that punitive damages were not awarded for similar conduct in the previous suit is irrelevant in terms of res judicata. Should it be determined at trial that Peggy disregarded the prior judgment and engaged in the same wrongful conduct, that in itself could imply malice. *See Harris v. Soley*, 2000 ME 150, ¶ 23, 756 A.2d 499. Because this Court is denying summary judgment on the preceding counts, it declines to resolve the issue of malice here, either.

CONCLUSION

Based on the foregoing, the entry will be: Defendants' motion to exclude is DENIED, Defendants' motion for judgment on the pleadings is GRANTED as to Counts 4 and 9, and the Defendants' motion for summary judgment is DENIED.

27

SO ORDERED.

The Clerk is requested to enter this Order on the Docket, incorporating it by reference pursuant to M.R. Civ. P. 79(a).

**Date:** 3/8/2022

_____

**M. Michaela Murphy, Justice**
**Business & Consumer Court**

.

Entered on the docket: 03/08/2022

STATE OF MAINE
CUMBERLAND, ss.

BUSINESS & CONSUMER DOCKET
LOCATION: PORTLAND
Docket No. BCDWB-CV-2019-042
(cons. w/ BCDWB-CV-2019-041)

|  |  |  |
|---|---|---|
| TUCKER J. CIANCHETTE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ERIC L. CIANCHETTE, | ) | |
| PEGGY A. CIANCHETTE and | ) | |
| PET, LLC, | ) | |
| | ) | **COMBINED ORDER ON** |
| Defendants. | ) | **MOTIONS FOR SUMMARY** |
| _____ | ) | **JUDGMENT** |
| | ) | |
| ERIC L. CIANCHETTE, | ) | |
| PEGGY A. CIANCHETTE and | ) | |
| PET, LLC | ) | |
| | ) | |
| Third-Party Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GOODY LLC, | ) | |
| ESPO LLC, and | ) | |
| TLNK LLC, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

Before the Court are three motions for summary judgment pursuant to Rule 56 of the Maine Rules of Civil Procedure. First, Defendants PET, LLC ("PET"), Eric L. Cianchette, and Peggy A. Cianchette move for partial summary judgment on Plaintiff Tucker Cianchette's Complaint. Second, Tucker Cianchette and the Third-Party Defendants move for summary judgment on PET, Eric Cianchette, and Peggy Cianchette's counterclaims. The Court will address these motions in order. Tucker Cianchette is represented by Attorneys Timothy Norton

1

and Jason Rice. Defendants are represented by Attorneys Lee Bals and Trey Milam. The Third-Party Defendants are represented by Attorney David Hirshon.

## STANDARD OF REVIEW

Summary judgment is appropriate if, based on the parties' statements of material fact and the cited record, there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. M.R. Civ. P. 56(c); *Levine v. R.B.K. Caly Corp.,* 2001 ME 77, ¶ 4, 770 A.2d 653. It follows, to survive a defendant's motion for summary judgment, the plaintiff must establish a prima facie case for each of their claims and set forth specific facts showing there is a genuine issue of material fact. *Key Trust Co. of Maine v. Nasson College,* 1997 ME 145, ¶ 10, 697 A.2d 408; *see also* M.R. Civ. P. 56(e). A fact is material if it has the potential to affect the outcome of the suit. *Id*. To be considered "genuine", there must be sufficient evidence offered to raise a factual contest requiring a fact finder to choose between competing versions of the truth. *Rainey v. Langden,* 2010 ME 56, ¶ 23, 998 A.2d 342; *Burdzel v. Sobus,* 2000 ME 84, ¶ 6, 750 A.2d 573.

Further, this showing "requires more than effusive rhetoric and optimistic surmise." *Hennessy v. City of Melrose,* 194 F.3d 237, 251 (1st Cir. 1999). The Court must ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Carroll v. Xerox Corp.,* 294 F.3d 231, 237 (1st Cir. 2002). "When a plaintiff has the burden of proof on an issue, a court may properly grant summary judgment in favor of the defendant if it is clear that the defendant would be entitled to a judgment as a matter of law if the plaintiff presented nothing more than was before the court" when the motion was decided. *Reliance Nat'l Indem. v. Knowles Indus. Servs., Corp.,* 2005 ME 29, ¶ 9, 868 A.2d 220.

2

**I.** **Defendant's PET LLC, Eric Cianchette, and Peggy Cianchette's Motion for Summary Judgment**

This action is made up of two consolidated cases. In one case, Peggy and Eric Cianchette (together the "Moving Parties") filed a Complaint seeking a declaratory judgment regarding certain provisions of the PET, LLC Operating Agreement (the "PET Agreement"). In the other case, Tucker Cianchette filed a multi-count complaint seeking various and sundry relief.

On December 16, 2019, the Court issued a *Combined Order on Defendants' Motion for Partial Judgment on the Pleadings and Motion to Dismiss for More Definite Statement* (the "Capital Transaction Order"). The Capital Transaction Order confirmed that the Moving Parties' could complete a Capital Transaction, pursuant to Section 4.4 of the PET Agreement, as a means of achieving a business divorce. However, the Court was clear that it did not "express any opinion about the *execution* of [the] procedure, nor as to any breach of duty by either party that could arise as part of the process." Capital Transaction Order at 8.

Since the Court issued the Capital Transaction Order, the Moving Parties have initiated a capital transaction, and assert that PET has officially merged with a new entity, Better Way Ford ("BWF"). Defendants bring their Motion for Summary Judgment, asserting that because the business divorce is complete, various of Tucker's claims fail as a matter of law.

**FACTS**

PET is a Maine limited liability company doing business as Casco Bay Ford, an automobile dealership primarily engaged in the business of selling and servicing Ford cars and trucks. (Def.'s S.M.F. ¶¶ 1-3.) The three members of PET, and the percentage of their ownership interest are as follows: Eric Cianchette (34%), Peggy Cianchette (33%), and Tucker Cianchette (33%). (Def.'s S.M.F. ¶ 4.)

As previously stated, on December 16, 2019, this Court issued the Capital Transaction Order, confirming that Section 4.4 of the PET Agreement allowed the Moving Parties to pursue a business divorce by means of a capital transaction, including a cash out merger. Capital Transaction Order at 8. The Moving Parties proposed a plan whereby PET would be valued, its assets would be transferred via sale or cash-out merger, and cash would be distributed to PET's members. *Id.* The Court confirmed that the proposed process would satisfy Section 4.4, but again, the Court was clear that it did not "express any opinion about the *execution* of [the] procedure, nor as to any breach of duty by either party that could arise as part of the process." Capital Transaction Order at 8.

The Moving Parties eventually voted for, and then adopted, an Emergency Resolution and Amended Plan of Merger (the "Merger Plan") between PET and BWF. The Moving Parties are listed as the sole members of BWF, each owning 50% of the LLC. (Def.'s S.M.F. ¶¶ 5-7.) The Merger Plan contained numerous provisions, including that "as of September 30, 2019, BWF assumed all lawfully due and owing debts and obligations of PET and BWF became vested with title to all of the assets of PET." (Def.'s S.M.F. ¶ 11.) Likewise the Merger Plan stated that "within 15 calendar days of BWF's receipt of the valuation report described in the Emergency Resolution, BWF was required to tender the difference in the fair market value of PET as of September 30, 2019", along with the amount of obligations assumed by BWF, to the members of PET. *Id.* Finally, the Merger Plan states that "all Membership interests in PET were terminated and canceled as of September 30, 2019. *Id.*

After the Merger Plan was approved, both PET and BWF signed a Statement of Merger and delivered it for filing with the office of the Secretary of State on April 3, 2020. (Def.'s

4

S.M.F. ¶ 12.)  The Statement of Merger provides that the "date the merger effective under the governing statute of the surviving organization" is "April 3, 2020." (Def.'s S.M.F. ¶ 12.)

BWF received a valuation report described in the Emergency Resolution on June 8, 2020 and provided it to Tucker, through counsel, on June 9, 2020. (Def.'s S.M.F. ¶¶ 13, 14.) The valuation report concluded that the fair market value of PET as of September 30, 2019 was $3,208,000 (the "Merger Market Value"). *Id.* Pursuant to the Merger Plan, certain distributions allegedly were to be made to the former PET members in the manner proscribed by Section 4.4 of the PET Agreement and based upon the Merger Market Value. (Def.'s S.M.F. ¶¶ 11,16.) Section 4.4 of the PET Agreement provides for distributions to Members in accordance with the positive balance in their respective Capital Accounts, after allocating profits and losses in accordance with Sections 4.1 and 4.2 of the PET Agreement and distributions pursuant to Section 4.2.3 of the PET Agreement. (Def.'s S.M.F. ¶ 4.) If any amounts remain to be distributed after all Capital Accounts have been reduced (or increased) to zero, then they are allocated to Interest Holders in accordance with their Percentages. *Id.*

On June 23, 2020, BWF provided Tucker with a document entitled "Allocation of Value on Merger detailing the allocation of income, expenses, and the Merger Market Value, attempting to follow Section 4.4 of the PET Agreement. (Def.'s S.M.F. ¶ 15.) Defendants have since filed the Motion for Summary Judgment at issue, asking the Court to declare The Merger valid and enforceable, and to grant summary judgment on certain of Tucker's claims.

### DISCUSSION

The Defendants bring their Motion for Summary Judgment on the basis that, 1) the Merger is valid and enforceable, 2) that of the nine counts in Tucker's Complaint, three seek relief premised on Tucker's status as a member of PET when judgment is entered, but Tucker is

5

no longer a Member, and 3) that the Court should enter judgment on their behalf regarding five of the remaining six counts in Tucker's complaint because the Capital Transaction, which took place on April 3, 2020, actually has an effective date of September 30, 2019.

**I.      There are genuine issues of material fact regarding whether the Merger of PET and BWF is valid and enforceable.**

When Defendants originally asked the Court for a declaratory judgment approving of the cash-out merger process, the question before the Court was, "does the PET LLC Agreement create a mechanism to accomplish a business dissolution?" Capital Transaction Order at 4. In practical terms, the Court noted, "Defendants seek to hire an independent, third party certified public accountant to determine the fair market value of Casco Bay Ford, transfer PET's assets to another LLC in which Peggy and Eric have membership interests, and distribute cash payment to all three members of PET in accordance with Section 4.4 of the LLC Agreement." *Id.*

What the Court was not asked to do, and in fact stated it would not do, was approve of, or determine liability relating to, the actual *execution* of the proposed merger that had not yet occurred. *Id.* However, now that the purported Merger has occurred, the Court has been asked to grant summary judgment in favor of the Defendants.

According to Defendants, PET's merger with BWF was by-the-book. Not only did the Merger comply with the requirements of Section 4.4 of the PET Agreement, but Defendants assert that it also complied with Maine law. The Legislature has proscribed procedural steps to be followed for two limited liability companies to merge. These are codified in §§ 1641- 1644 of the Maine Limited Liability Company Act (31 M.R.S. § 1501, *et seq.*) (the "LLC Act"). Although Defendants, at face value, appear to have complied with the Maine Limited Liability Company Act's procedural requirements, Tucker raises questions of fact regarding Defendants' compliance with Section 4.4 of the PET Agreement.

6

Defendants' allege that "As of June 23, 2020, the amounts owed to each Member pursuant to the Distribution Allocation were distributed in accordance with Section 4.4 of the PET Agreement. (Def.'s S.M.F. ¶ 16.) Conversely, "Tucker denies that, as of June 23, 2020, the amounts owed to each Member pursuant to the Distribution Allowance were distributed in accordance with Section 4.4. (Pl.'s Opp. S.M.F. ¶ 16.) Tucker directs the Court to the $0 valuation of his membership interest, along with various other alleged inconsistencies in the PET business records, including examples of unapproved insider compensation. (Pl.'s Add. S.M.F. ¶ 9.) According to the Capital Transaction Order, Section 4.4 of the PET Agreement provides a mechanism for a cash-out merger of PET. It follows that, to be valid the Merger must comply with Section 4.4. Because genuine issues of material fact exist regarding the execution of the Merger, the Court declines to grant summary judgment on its validity at this stage.

## II.     Regardless of the Merger's Validity, Defendants are not entitled to Summary Judgment

The Court has not confirmed the validity of the Merger. Thus, the Court will not grant summary judgment on Tucker's various claims on the basis of a valid Merger. However, even were the Merger held valid and enforceable, Defendants' motion would fail.

First, Defendants move for summary judgment on Counts VI, VII, and VIII, arguing that because Tucker is no longer a Member of PET, he can no longer assert claims relying on his status as a Member. According to Section 1644(1) of the Limited Liability Act, "[a]n action or proceeding pending by or against any constituent organization that ceases to exist may be continued as if the merger had not occurred, and the surviving organization may be, but not need be, substituted in the action." It follows, Tucker may maintain his suit against PET "as if the merger had not occurred."

Likewise, Defendants assert that to the extent Tucker seeks damages arising after September 30, 2019, the purported effective date of the Merger, the Court should grant summary judgment in favor of Defendants.[1] Defendants basis for claiming the Merger took effect on September 30, 2019 is the portion of the Merger Agreement which states as follows:

> as of September 30, 2019, BWF assumed all lawfully due and owing debts and obligations of PET and BWF became vested with title to all of the assets of PET; W]ithin 15 calendar days of BWF's receipt of the valuation report described in the Emergency Resolution, BWF was required to tender the difference in the fair market value of PET as of September 30, 2019; and, [A]ll Membership interests in PET were terminated and canceled as of September 30, 2019.

(Pl.'s S.M.F. ¶ 11.)

The Maine LLC Act establishes the effective date of a merger. 31 M.R.S. § 1643(4) provides that, regarding a merger where both the constituent and the surviving entities are LLC's, a merger becomes effective "*upon the later of*: (1) Compliance with subsection 3 [i.e. filing of the Statement of Merger with the Secretary of State]; and (2) As specified in the statement of merger. . ." (emphasis added). The plain language of the LLC Act states that it is the *later* of the above events that controls the effective date of a merger. Thus, by operation of law, the Merger cannot be effective prior to the filing of the Statement of Merger with the Secretary of State, regardless of the date specified in the Statement of Merger. The Statement of Merger in this case was filed with the Secretary of State on April 3, 2020. (Def.'s S.M.F. ¶ 11.)

---

[1] Defendants previously requested that the Court acknowledge a retroactive effective date of the Merger in their Motion to Establish Effective Date. Defendants relied on 14 M.R.S. § 5960 which they claimed permitted the Court in a declaratory judgment action to grant "further relief" whenever "necessary or proper". The Court previously declined to acknowledge the 9/30/2019 purported effective date, stating that "the statute relied upon by Defendants does not permit the Court to select the effective date as a remedy under these circumstances." *Order on Motion to Establish Effective Date* at 3.

8

Accordingly, the Merger cannot be effective prior to April 3, 2020, and the Court declines to grant summary judgment in favor of Defendants for damages occurring after September 30, 2019. Defendants' Motion for Summary Judgment is denied in its entirety.

## II. Tucker Cianchette and Third-Party Defendants' Motions for Summary Judgment on Peggy and Eric Cianchette's Counterclaims

### FACTS

The Defendants' counterclaim includes the following six claims against Tucker: Counts I and II allege Intentional Infliction of Emotional Distress; Count III alleges Defamation; Count IV asserts a claim for violation of 10 M.R.S. § 1174; Count V asserts a claim for violation of 18 U.S.C. § 1836; and Count VI asserts a claim for violation of the Uniform Trade Secrets Act. Each of these counts arise from three distinct events.

### A. Tucker's Letter

Eric and Peggy Cianchette's claims for Intentional Infliction of Emotional Distress arise from a letter Tucker wrote and delivered to Eric and Peggy in or around May 2018. Tucker is Eric's son and Peggy's stepson, and personal disputes and disagreements between them have existed for years, recently resulting in litigation and a 2018 jury verdict against Eric and Peggy. *See Cianchette v. Cianchette,* 2019 ME 87, 209 A.3d 745. Despite said personal disputes, Peggy would occasionally send gifts to Tucker's house for his three children. (Def.'s Countercl. ¶ 21; Pl.'s Ans. ¶ 21.) Tucker wrote Eric and Peggy a letter in or around May 2018 in response to their sending of gifts to his children. (S.M.F. ¶ 11.) The language of the letter is included below in its entirety:

Eric and Peggy,

Our kids need loving and supportive people in their lives. We do not accept gifts from people who steal with their left hands and give with their right hands.

9

As far as Emily, Erica and Kenny's gifts go, although it was a gracious offer, receiving material items from family that has elected to not have meaningful relationships, regardless of their chosen justification, sends a very confusing message to young impressionable children.

Accepting responsibility for your actions is a critical part of being a mature, responsible adult.

Bill Cosby, Joe Paterno, and Harvey Weinstein have cemented their legacy, it appears that outside of your bubble you may have as well.

(Def.'s Countercl. Ex. A.) After drafting the letter, Tucker placed it in an envelope and asked his friend, JJ Lee, to deliver it to Eric and Peggy along with boxes and bags that contained unopened gifts previously sent to Tucker's children. (S.M.F. ¶ 12.)

**B. The Penfold Survey**

Count III for defamation and in part, Count IV for violation of 10 M.R.S. § 1174 arise from an incident in 2018 involving William Penfold, a former employee of both PET, LLC and Goody LLC. (*See* Def.'s Countercl. ¶¶ 42-48, 51; S.M.F. ¶¶ 14-15.) Penfold worked for PET, LLC at the Casco Bay Ford dealership sometime prior to December 2017 and was "unhappy with [his] employment experience." (S.M.F. ¶¶ 14-15.)

Before working for PET, LLC, Penfold worked for a separate Ford dealership in Wiscasset when he was involved in a truck sale that did not go "particularly well." (S.M.F. ¶¶ 16-17.) Because Penfold was concerned that the sale would lead to a negative customer survey, he listed his own personal email address in place of the customer's (without the customer's knowledge) so that any Ford Motor Company communications to the customer would instead be sent to Penfold. (S.M.F. ¶ 17.) Penfold eventually went on to work for PET, LLC, and after that was hired as a sales manager for Goody LLC on or around September 1, 2018. (S.M.F. ¶ 18.)

10

Shortly thereafter, in the fall of 2018, Penfold received a customer survey regarding services provided by PET, LLC. (S.M.F. ¶ 19.) Penfold received the customer survey in the personal email account he used in place of the Wiscasset customer's email account some years earlier. (S.M.F. ¶ 19.) While watching television at home, Penfold completed and submitted an unfavorable survey about PET, LLC. (S.M.F. ¶¶ 19-20.) Penfold has stated that his decision to submit the unfavorable survey was motivated by grievances with his former employer, PET, LLC. (S.M.F. ¶¶ 20, 22.) Despite working with Tucker at Goody LLC when the unfavorable survey was submitted, Penfold never told Tucker about the survey. (S.M.F. ¶ 22.) Tucker learned of the survey later that fall, when Melissa Sullivan of Ford Motor Company informed him of it. (S.M.F. ¶ 23.) At that time Tucker was employed as Penfold's superior, and reprimanded Penfold for his conduct. (S.M.F. ¶ 24.)

## C. The "Red Letter" Promotion

Finally, the remaining counts of Eric and Peggy's counterclaim relate to a sales promotion (the "Red Letter" promotion) put on by Goody LLC in or around October 2019. (Def.'s Counterclaim ¶¶ 49-61.) At the time of the Red Letter promotion, Tucker was not an employee of Goody LLC. (S.M.F. ¶ 36.)

The promotion involved mailing 2,500 letters in red envelopes to individuals residing within twenty miles of 04011 (the zip code associated with Goody LLC's Brunswick Ford location) that had purchased a Ford vehicle with model years of 2009-2017 prior to October 2017.[2] The promotion was conducted by Axiom Marketing Services, who identified the individuals to include in the promotion through publicly available information, including the

---

[2] The Red Letter promotion extended to customers who purchased a car matching the criteria from any dealership in the applicable radius. (*See* S.M.F. ¶ 28.) Customers who fit the criteria but had previously purchased a vehicle from any of the Third-Party Defendants were removed from the Red Letter mailing. (S.M.F. ¶ 29.)

11

Maine Bureau of Motor Vehicles. (S.M.F. ¶ 30.) Tucker was not involved in the promotion and did not communicate with Goody LLC or any employees of Axiom Marketing Survey about it.

**DISCUSSION**

**Counts I and II: Intentional Infliction of Emotional Distress**

Counts I and II of Eric and Peggy Cianchette's counterclaim alleges Intentional Infliction of Emotional Distress ("IIED"), against Tucker for writing the letter, and against Third-Party Defendants on a theory of vicarious liability because an employee ( J.J. Lee) delivered the letter. Tucker and Third-Party Defendants both move for summary judgment on Counts I and II. Eric and Peggy have failed to establish the elements of an IIED claim, as Tucker's conduct was not "extreme and outrageous" as defined by Maine law. Therefore, both Tucker and Third-Party Defendants are entitled to summary judgment on Counts I and II.

A party is subject to liability for IIED when he "engages in extreme or outrageous conduct that intentionally or recklessly inflicts severe emotional distress upon another." *Vicnire v. Ford Motor Credit Co.,* 401 A.2d 148, 155 (Me. 1979). To survive summary judgment, a prima facie case for IIED must be established with the following four elements:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from [his] conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Argerow v. Weisberg,* 2018 ME 140, ¶ 27, 195 A.3d 1210 (quoting *Curtis v. Porter,* 2001 ME 158, ¶ 10, 784 A.2d 18). "[I]n the context of summary judgment for a claim for intentional inflection of emotion distress, 'it is for the court to determine in the first instance whether the defendant's conduct may reasonably regarded as so extreme and outrageous to permit

12

recovery.'" *Lougee Conservancy v. CitiMorgage, Inc.,* 2012 ME 103, ¶ 26, 48 A.3d 774 (quoting *Champagne v. Mid-Me. Med. Ctr.,* 1998 ME 87, ¶ 16, 711 A.2d 1086, 1090 (Me. 1995).

The Law Court has adopted the rule of liability for IIED stated in the Restatement (Second) of Torts § 46. *Vicnire v. Ford Motor Credit Co.,* 401 A.2d 148, 154 (Me. 1979). According to the Restatement, "liability has been found only where the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Restatement (Second) of Torts § 46, cmt. d. Additionally, the liability "clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.* At times, individuals ". . . must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." *Id.*

There are no genuine issues of material fact relating to the letter at issue. It is undisputed that Tucker wrote the letter and had it delivered to Eric and Peggy, along with unopened gifts they had previously sent to Tucker's children. (S.M.F. ¶¶ 11-12.) However, the Court concludes that Tucker's conduct in this instance does not reach the established standard for extreme and outrageous conduct. Although the contents of the letter and the refusal of gifts may be insulting and upsetting, Tucker's conduct is not so "outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."[3] Restatement (Second) of Torts § 46, cmt. d.

---

[3] For instance, in *Botka v. S.C. Noyes & Co.,* the Court upheld summary judgment in favor of the defendant where the conduct at issue included interfering with the plaintiffs' business activities, frequently interrupting, berating, insulting, and harassing the plaintiffs alone or in front of others, initiating a physical confrontation with one plaintiff, and threatening plaintiffs with eviction. 2003 ME 128, ¶¶ 10, 19. Conversely, the Law Court denied a defendant's motion for summary judgment when the conduct at issue included the defendant's set up a nighttime robbery of a delivery person, which actually resulted in severe emotional distress. *Curtis v. Porter,* 2001 ME 158, ¶ 15, 784 A.2d 18.

Even if the Court were to find Tucker's conduct "extreme and outrageous", to make out a prima facie case of IIED a plaintiff must also show that they suffered emotional distress "so severe that no reasonable person could be expected to endure it." *Agerow,* 2018 ME 140, ¶ 27, 195 A.3d 1210. Peggy Cianchette asserts that, due to letter at issue, she had physical symptoms resulting from the stress which she tried to address by increasing the dosages of her medications and seeking alternative treatments. (S.A.M.F. ¶ 78.) Likewise, Peggy Cianchette states that she continues to struggle with high blood pressure, depression, and sleeplessness as a result of the letter. (S.A.M.F. ¶ 77.)

Despite Peggy Cianchette's alleged symptoms, "Stress, humiliation, loss of sleep, and anxiety occasioned by the events of everyday life are endurable." *Schelling v. Lindell,* 2008 ME 59, ¶ 26, 942 A.2d 1226. Distress, irritation, and emotional upset "will rarely constitute the kinds of damages that are 'so severe' that a reasonable person could not be expected to carry on." *Id.* "Even if the distress that [a plaintiff] claims he suffered was, in actuality, severe, he must still show that 'the harm alleged *reasonably* could have been expected to befall the ordinarily sensitive person.'" *Holland v. Sebunya,* 2000 ME 160, ¶ 18, 759 A.2d 205 (quoting *Theriault v. Swan,* 558 A.2d 369, 372 (Me. 1989) (emphasis added). The type of distress an ordinarily sensitive plaintiff would experience from receiving Tucker's letter and returned gifts would not be of the severity that no reasonable person could be expected to endure it. Because Eric and Peggy Cianchette's counterclaim does not establish a prima facie case for IIED, Tucker's motion for summary judgment on Counts I and II is granted.

Additionally, the Court grants the Third-Party Defendants' motion for summary judgment with respect to Counts I and II. Because the underlying letter, and Third-Party Defendants' employee JJ Lee's delivery thereof, does not meet the high bar for extreme and

14

outrageous conduct, the Third-Party Defendants cannot be held vicariously liable for Intentional Infliction of Emotional Distress.

**Counts III and IV: Defamation**

Tucker and the Third-Party Defendants also move for summary judgment on Counts III and IV of Eric and Peggy Cianchette's counterclaim in which they allege defamation in connection with the Penfold survey, and that the defamation was in violation of 10 M.R.S. § 1174. In their counterclaim, Eric and Peggy allege that Tucker was "acting in his capacity as General Manager" when he directed the publication and communication of the Penfold survey. (Def.'s Countercl. ¶¶ 44, 48.)

Despite Eric and Peggy's allegations, there is no genuine dispute as to the material fact that Tucker was not involved in the Penfold survey in any capacity. When Penfold originally recorded his personal email address in place of the potentially dissatisfied customer he was an employee at Wiscasset Ford. (S.M.F. ¶ 17.) Penfold then worked for PET, LLC, followed by Goody LLC. (S.M.F. ¶ 18.) Penfold completed the false survey at his home while watching television. (S.M.F. ¶¶ 19-20.) Penfold never told Tucker about the survey, until Tucker learned of it from a Ford representative. (S.M.F. ¶ 23.) After Tucker learned of the false survey, Penfold was reprimanded. (S.M.F. ¶ 24.) Eric and Peggy provide no contradictory evidence indicating that Tucker was involved in the survey at any point, or in any capacity.

Additionally, Peggy and Eric argue on a theory of vicarious liability that Tucker, as Penfold's supervisor at the time the false survey was completed, is liable for Penfold's conduct. "[A] prerequisite to imposing vicarious liability is the existence of an employer-employee relationship." *Rainey v. Langen,* 2010 ME 56, ¶ 14, 998 A.2d 342. It is undisputed that Tucker was Penfold's supervisor, but both Tucker and Penfold were employees of Goody LLC. (S.M.F.

15

¶ 18, Def.'s Countercl. ¶ 24.) Tucker's role as general manager of Goody LLC is not enough to transform his employer-employee relationship with Penfold into an employer-employee relationship. *See* Restatement (Third) of Agency § 3.15 (2006) ("Coagents, although they may occupy dominant and subordinate positions within an organizational hierarchy, share a common principal.") Because the imposition of vicarious liability depends on the existence of an employer-employee relationship between Tucker and Penfold, and none exists, Tucker cannot be held vicariously liable.

Finally, Eric and Peggy contend that Tucker made a separate defamatory statement in response to Ford's email asking him what steps he had taken to prevent a recurrence of Penfold's submission of a survey for a Casco Bay Ford customer. Eric and Peggy did not include this allegation in the Third-Party Complaint and detailed this allegation too late to amend said complaint, as the deadline for amending the pleadings was February 21, 2020. *See* Order on Plaintiff's Motion to Amend Scheduling Order Deadlines dated July 16, 2020. Nevertheless, Eric and Peggy's claim would likewise fail on the merits. A claim for defamation requires a statement that is both defamatory, *i.e.,* tending "to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him," and false. *Morgan v. Kooistra,* 2008 ME 26, ¶ 26, 941 A.2d 447; *Rippett v. Bemis,* 672 A.2d 82, 86 (Me. 1996).

The statement at issue, which Tucker wrote in an email to Ford's Regional Manager, reads as follows:

> I do think it warrants noting that any onus regarding a violation be spread equally, if not more, to Wiscasset and Casco Bay Ford. My employee had only been employed here for a matter of weeks when he filled out the survey, his private email was listed incorrectly when he was employed by Wiscasset, and Casco Bay…submitted false information that prompted a survey.

(S.A.M.F. ¶ 107.) In the above statement, Tucker describes the short length of time Penfold had been working for Goody, LLC, points out that Penfold had incorrectly listed his private email when he was employed by Wiscasset, and that Casco Bay Ford's customer file was submitted without being updated, prompting the survey which was emailed to Penfold. The statement aligns with the undisputed facts of the case and cannot be reasonably construed as false. Thus, the Court grants Tucker's motion for summary judgment with respect to Count III.

In addition to Tucker, Eric and Peggy bring Count III against the Third-Party Defendants. Here, Eric and Peggy's claims are based entirely on vicarious liability. However, unlike Tucker, Goody LLC was Penfold's employer at the time he submitted the false survey. It follows, Eric and Peggy's claim against the Third-Party Defendants satisfies the first prerequisite of imposing vicarious liability: the existence of an employer-employee relationship. *Rainey,* 2010 ME 56, ¶ 14, 998 A.2d 342.

An employer may be held vicariously liable for actions of its employee when the employee's conduct was within the scope of employment. *See Mahar v. StoneWood Transport,* 2003 ME 63, ¶ 13, 823 A.2d 540. Maine applies the Restatement (Second) of Agency to determine the limits of imposing vicarious liability on an employer. *Id.* The Restatement provides:

(1) Conduct of a servant is within the scope of employment if, but only if:
   (a) it is of the kind he is employed to perform;
   (b) it occurs substantially within the authorized time and space limits;
   (c) it is actuated, at least in part, by purpose to serve the master, and
   (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

(2) Conduct of a servant is not within the scope of employment if it's different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

17

*Id.* ¶¶ 13-14 (quoting Restatement (Second) of Agency § 228). "Actions that are done with a private, rather than a work-related, purpose to commit wrongdoing are outside of the scope of employment . . ." *Id.* ¶ 14 (quoting *Nichols v. Land Transp. Corp.,* 103 F.Supp.2d. 25, 27 (D. Me. 1999), *aff'd,* 223 F.3d 21 (1st Cir. 2000).

Penfold did not submit the false survey in the scope of his employment. First, the writing and submission of customer surveys, whether truthful or not, is not conduct Penfold performed as sales manager. Second, Penfold's conduct took place during non-work hours, while watching television in his own home, using his personal email address. (S.M.F. ¶¶ 19-20.) Penfold stated that his actions were motivated by his negative personal feelings about his prior employer, PET, LLC, and had nothing to do with his employment with Goody LLC, nor his relationship with Tucker. (S.M.F. ¶¶ 17-21.) The fact that Penfold was employed by Goody LLC at the time he submitted the false survey is legally insufficient to establish vicarious liability. The Court grants summary judgment in favor of the Third-Party Defendants on Count III of the counterclaim.

Relatedly, Count IV of Eric and Peggy's counterclaim alleges a violation of 10 M.R.S. § 1174 (1), which provides in pertinent part, that is unlawful for any motor vehicle dealer to engage in any action which is "arbitrary, in bad faith or unconscionable" which causes damage to, among others, another dealer. Because neither Tucker, nor the Third-Party Defendants made directly defamatory statements, nor are vicariously liable for the submission of the false survey, a jury could not find either party liable for violating 11 M.R.S. § 1174(1). Tucker Cianchette and the Third-Pary Defendants' Motion for Summary Judgment is granted on this count.

**Counts V and VI: Violations of 18 U.S.C § 1836, and the Uniform Trade Secrets Act**

The final two counts of Eric and Peggy's counterclaim allege violations of 18 U.S.C. § 1836, and the Uniform Trade Secrets Act in connection with the "Red Letter" promotion. The

Third-Party Complaint alleges that Tucker and the Third-Party Defendants used confidential information obtained from PET, LLC for the purpose of the promotion. However, Eric and Peggy's claims are not supported by sufficient evidence, and therefore do not survive Tucker or the Third-Party Defendants' Motions for Summary Judgment. Eric and Peggy also concede this point.

Tucker and the Third-Party Defendants both assert that the information used to target customers for the promotion was publicly available and ascertained through proper means.[4] In their Opposition to the Third-Party Defendants' Motion for Summary Judgment, Eric and Peggy state that they "do not oppose the Yankee Group Motion insofar as the Red Letter is concerned. Accordingly, the Court grants Tucker and the Third-Party Defendants' motions for summary judgment regarding Counts V and VI.

## CONCLUSION

For the foregoing reasons, Defendants Eric and Peggy Cianchette's Motion for Summary Judgment is denied. Genuine issues of material fact remain regarding the validity of the Merger and its compliance with Section 4.4 of the PET Agreement. Because there are no genuine issues of material fact regarding Defendants' counterclaim, the Court grants both Tucker Cianchette and Third-Party Defendants' Motions for Summary Judgment on all counts.

The Clerk is requested to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

Dated: 6/28/2021

_____
**M. Michaela Murphy, Justice**
**Business and Consumer Court**

---

[4] Specifically, Tucker and the Third-Party Defendants assert they relied on the Maine Bureau of Motor Vehicles to access publicly available information. (S.M.F. ¶ 30.)

19

TUCKER CIANCHETTE

    *Plaintiff(s)*

*v.*

ERIC CIANCHETTE, et al.

    *Defendant(s)*


Party Name:                                    Attorney Name:

*Tucker Cianchette*                        Timothy Norton, Esq.
                                             Kelly Remmel & Zimmerman
                                             53 Exchange Street
                                             PO  Box 597
                                             Portland, ME 041004112-05974-5029


*Eric and Peggy Cianchette,*        Lee Bals, Esq.
*and PET, LLC*                                     Marcus Clegg
                                             16 Middle Street Suite 501
                                             Portland, ME 04101-5166


*ESPO, LLC*                                David Hirshon, Esq.
*GOODY, LLC*                                      Hirshon Law Group PC
*TLNK, LLC*                                       PO Box 124
                                             40 Regatta Drive
                                             Freeport, ME 04032

STATE OF MAINE
CUMBERLAND, ss.

BUSINESS & CONSUMER DOCKET
DOCKET NO. BCD-CV-2019-042
(cons. w/ BCD-CV-2019-041)

TUCKER J. CIANCHETTE                   )
                                       )
        Plaintiff,                     )
                                       )    **COMBINED ORDER ON**
        v.                             )    **DEFENDANTS' MOTION FOR**
                                       )    **PARTIAL JUDGMENT ON THE**
ERIC L. CIANCHETTE,                    )    **PLEADINGS AND MOTION TO**
PEGGY A. CIANCHETTE and                )    **DISMISS OR FOR A MORE**
PET, LLC,                              )    **DEFINITE STATEMENT**
                                       )
        Defendants.                    )


Before the Court are two motions: Defendants' motion for partial judgment on the

pleadings according to M. R. Civ. P. 12(c), and Defendants' motion to dismiss the complaint, or

in the alternative, for a more definite statement. The Court grants Defendants' motion for a

partial judgment on the pleadings. The Court denies Defendants' motion to dismiss or for a more

definite statement, except with regard to Plaintiff's request for attorney fees, for which

Defendants' motion is granted.


## BACKGROUND

PET is a Maine limited liability company which owns and operates the Casco Bay Ford

dealership located in Yarmouth, Maine. Plaintiff Tucker Cianchette, and Defendants Eric and

Peggy Cianchette are members of PET LLC each owning a 33%, 34%, and 33% interest

respectively. The operation of PET and the rights and responsibilities of members and managers

of PET are governed by the LLC Agreement of PET ("LLC Agreement").

1

In June of 2016, Plaintiff Tucker filed a lawsuit against Eric and Peggy for, among other things fraud, breach of contract, and breach of fiduciary duty with regard to the operation of PET, as well as Eric and Peggy's conduct in relation to a proposed sale of their PET membership interests. Significantly, the breach of fiduciary duty verdict against Peggy was founded in large part on Peggy's actions as manager of PET. Peggy was found to have artificially inflated rent paid by PET to another LLC of which Eric and Peggy were members, and made loans to other commonly owned LLCs while acting as manager of PET. As a result of the 2016 lawsuit, Tucker was awarded $5,900,000 in damages on March 5, 2018. The Law Court affirmed the judgment on June 4, 2019.

Tucker now brings this current lawsuit under the belief that Peggy, still acting as manager of PET LLC, has conspired with Eric to continue engaging in the wrongful conduct for which they were already held liable in the 2016 lawsuit. In particular, Tucker asserts Defendants have continued to charge PET exorbitant rent to occupy property owned by another of Defendants' commonly owned LLCs. Likewise, Tucker alleges Defendants have continued to loan PET's money to their own entities. Both actions were already found in violation of the PET LLC Agreement, as well as the LLC Act. Additionally, Tucker asserts Defendants have engaged in additional wrongful conduct not previously the subject of litigation in the 2016 lawsuit. These claims involve Peggy refusing to make distributions of PET cash flow as provided for in the LLC Agreement, Defendants payment of interest on their capital contributions to PET, as well as Tucker's suspicion that other wrongful acts are occurring out of his sight.[1] Tucker believes Defendants Eric and Peggy Cianchette intentionally seek to reduce or eliminate any financial benefit to him from PET despite his 33% membership interest. In response to Tucker's

_____

[1] Tucker asserts he has made formal requests for access to the financial books and records of PET but had not been provided those documents prior to the filing of his complaint, or oral argument which occurred on 12/2/19.

complaint, Defendants have filed two motions, one seeking a declaratory judgment, and the other a motion to dismiss the complaint, or in the alternative for a more definite statement.

## STANDARD OF REVIEW

In this matter, Defendants have filed both a motion for partial judgment on the pleadings, as well as a motion to dismiss the complaint. When a motion for a judgment on the pleadings is filed by the defendants pursuant to M.R. Civ. P. 12(c), only the legal sufficiency of the complaint is tested. *Wawenock, LLC v. Department of Transporation*, 2018 ME 83, ¶ 4, 187 A.3d 609 (citing *Cunningham v. Haza*, 538 A.2d 265, 267 (Me. 1998) (quotation marks omitted). A defendants' motion for judgment on the pleadings is treated identically to a motion under M. R. Civ. P. 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief can be granted. *Id.*

In reviewing a motion to dismiss under Rule 12(b)(6), the Court "consider[s] the facts in the complaint as if they were admitted." *Bonney v. Stephens Mem. Hosp.*, 2011 ME 46, ¶ 16, 17 A.3d 123. The complaint is viewed "in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." *Id.* (quoting *Saunders v. Tisher*, 2006 ME 94, ¶ 8, 902 A.2d 830). "Dismissal is warranted when it appears beyond a doubt that the plaintiff is not entitled to relief under any set of facts that he might prove in support of his claim." *Id.* "The legal sufficiency of a complaint challenged pursuant to M.R. Civ. P. 12(b)(6) is a question of law" and thus subject to de novo appellate review. *Marshall v. Town of Dexter*, 2015 ME 135, ¶ 2, 125 A.3d 1141.

3

**DISCUSSION**

## I.  Defendants' Motion for a Partial Judgment on the Pleadings

Defendants seek partial judgment on the pleadings to resolve this legal question: does the PET LLC Agreement create a mechanism to accomplish a business dissolution? In practical terms, Defendants seek to hire an independent, third party certified public accountant to determine the fair market value of Casco Bay Ford, transfer PET's assets to another LLC in which Peggy and Eric have membership interests, and distribute cash payment to all three members of PET in accordance with Section 4.4 of the LLC Agreement. Defendants assert this process qualifies as a "Capital Transaction" as defined in the LLC Agreement, and thus with majority support, can be used to effectuate the proposed business dissolution.

Conversely, Tucker asserts that his answer and affirmative defenses are sufficient to establish facts that when viewed in the light most favorable to him, prevent the Court from making this decision as a matter of law. Likewise, Tucker insists granting the motion at issue would require the Court to ignore questions of fact regarding Defendants' fiduciary duties, as well as their duty of good faith and fair dealing. However, Defendants do not ask for (and the Court would not grant), a waiver of liability for breaches of any of their duties as part of this motion.

Tucker also points to the LLC Agreement which provides: any "dealings and undertakings" with affiliates of members of PET are permissible, so long as they are on terms which are at "arm's length and commercially reasonable." (Pl.'s Ex. A §5.4.3.) Tucker insists whether the transaction would be at arm's length and commercially reasonable is a question of fact. The Court is not asked at this time whether the *execution* of the proposed capital transaction will be at arm's length and is commercially reasonable. The transaction has not yet occurred, and multiple procedural and substantive safeguards can be implemented to ensure that the process is

4

fair, and that it results in an arm's length and commercially reasonable transaction. Rather, the Court is asked at this junction to decide only whether the procedure described by Defendants qualifies as a capital transaction under the LLC Agreement and is thus an acceptable method of achieving a business dissolution. LLC Agreements are contracts, and it is black letter law that the interpretation of a contract is a question of law. *QAD Investors v. Kelly*, 2001 ME 116, ¶ 13, 776 A.2d 1244. Thus, this inquiry is purely legal and Tucker's arguments to the contrary are unpersuasive.

Limited liability companies in Maine are governed by the Maine Limited Liability Company Act ("the LLC Act"). The LLC Act provides: "the limited liability company agreement governs relations among members as members and between the members and the limited lability company." 31 M.R.S. § 151(1). When an LLC agreement speaks to an issue, it controls. 31 M.R.S. § 1521(1), 1522. Otherwise, the LLC Act controls, or fills in the gaps of the agreement. 31 M.R.S. § 1521(2).

Defendants assert the PET LLC Agreement speaks directly to how a business dissolution may be achieved. Specifically, Defendants contend a Capital Transaction as defined in Section 4.4 of the LLC Agreement allows them, with majority approval, to sell PET's assets to another of their LLCs, or to merge with one. According to Section 4.4 of the LLC Agreement, a Capital Transaction is:

> any transaction not in the ordinary course of business which results in the Company's receipt of cash or other consideration other than Capital Contributions, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancing, condemnations, recoveries of damage awards, and insurance proceeds.

5

(Pl.'s Ex. A § 4.4). Accordingly, a capital transaction may include the sale of PET's assets, or another transaction so long as it is outside the ordinary course of business and results in PET's receipt of cash or other consideration. In effect, the business of PET would be sold, or merged with another LLC, and PET's members would receive payment for their interests based on PET's fair market value, and the distribution rules found in the LLC Agreement. Defendants' general plan to value the business, transfer its assets, and distribute payment to PET's members qualifies as a Capital Transaction.

Plaintiff Tucker contends a merger does not qualify as a capital transaction, as it is not explicitly listed as one of the examples of such a transaction in its LLC Act definition. Additionally, Tucker asserts that plans of merger are not directly spoken to elsewhere in the LLC Agreement, and thus, the provisions of the LLC Act control. Section 1642 of the LLC Act provides that "[a] plan of merger must be consented to by all members of the constituent limited liability company." 31 M.R.S. 1642(a).

Despite PET's failure to explicitly include a cash-out merger as an example of a capital transaction, the definition makes clear that the definition includes specific examples "without limitation." A capital transaction as described in the LLC Agreement must be a transaction, not in the ordinary course of business, that results in PET receiving cash or other consideration. A cash-out merger satisfies this definition and thus, Tucker's argument is unpersuasive.

Likewise, Tucker's argument that the capital transaction described by Defendants would violate Section 1554 of the LLC Act is unpersuasive. Section 1554 provides: "[a] person does not have a right to demand and receive a distribution from a limited liability company in any form other than money. Except as otherwise provided. . . a limited liability company may distribute an asset in kind if each person receives a percentage of the asset equal in value to the

6

member's share of distributions." Section 1544 does not apply to Defendants' proposed transaction. Defendants are not requesting distributions of PET assets in kind to them personally. Instead, Defendants aim to participate in an arm's length transaction, resulting in the sale or merger of PET's assets with another LLC. The fact that Defendants are members of the other LLC does not transform the capital transaction into a distribution of assets directly to members.

In addition to Defendants' argument that a capital transaction as defined in the LLC Agreement provides a mechanism for a business dissolution, Defendants assert a capital transaction can be initiated with or without Tucker's approval. The PET LLC Agreement provides the manager (Defendant Peggy Cianchette) substantial authority to make decisions on behalf of the company. It establishes the manager's powers as follows:

> The Manager shall have full, exclusive and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to manage, control, administer and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs [. . .]

(Pl.'s Ex. A § 5.1.2.) Nevertheless, the LLC Agreement also specifies particular transactions, such as capital transactions, that must receive member approval. These transactions are labeled "Extraordinary Transactions". (Pl.'s Ex. A § 5.1.3.1.) The LLC Agreement also provides a process for achieving approval of the members; either an affirmative vote by a 51% majority of Members, or by a written instrument indicating "consent of Members holding a majority of the Percentages then held by members." (Pl.'s Ex. §§ 5.2.2, 5.2.3.) Accordingly, the approval of Peggy and Eric Cianchette, amounting to 67% of Percentages held by members, would satisfy the LLC Agreement's required member approval.

In conclusion, the Court holds that Defendants' proposed valuation of PET, transfer of its assets (via sale or cash-out merger), and provision of cash distributions to its members qualifies as a capital transaction as defined by Section 4.4 of the PET LLC Agreement. Thus, the parties may achieve a business dissolution in accordance with this procedure. The Court does not herein express any opinion about the *execution* of this procedure, nor as to any breach of duty by either party that could arise as part of the process.

## II.      Defendants' Motion to Dismiss or for a More Definite Statement

In addition to their motion requesting partial judgment on the pleadings, Defendants seek dismissal of Plaintiff's claims against them, or in the alternative a more definite statement. Defendants assert that all of the Counts included in Plaintiff Tucker's complaint: 1) are barred by the doctrine of *res judicata,* 2) fail to state a claim upon which relief can be granted, or 3) are remedies and not independent claims that stand alone as causes of action.

### a.   Res Judicata Does Not Bar Tucker's Claims

The doctrine of *res judicata* consists of two concepts: issue preclusion and claim preclusion. *Pearson v. Wendell,* 2015 ME 136, ¶ 23, 125 A.3d 1149. While issue preclusion prevents the re-litigation of factual issues already decided in a prior case, claim preclusion prevents the litigation of claims that were, or could have been litigated in a prior case. *Town of Mt. Vernon v. Landherr,* 2018 ME 105, ¶ 15, 190 A.3d 249; *Portland Water Dist. v. Town of Standish,* 2008 ME 23, ¶ 8, 940 A.2d 1097. Defendants argue Counts I, II, IV, V, VI, VIII, and IX of Tucker's complaint were based, "in whole or in part, on matters which were, or could have been, litigated in the 2016 Lawsuit and are, therefore, barred." (Mot. Dismiss 5.)

Count I of Tucker's complaint is a claim for breach of contract against Defendants alleging they breached the LLC Agreement as well as the covenant of good faith and fair dealing. Specifically, Tucker contends Defendants have:

(i) continu[ed] a no interest loan to the Cianchette Family, LLC; (ii) establish[ed] the rent amount to be paid by PET to Cianchette Family, LLC at an above market rent for their own benefit and to the detriment to Tucker; (iii) refus[ed] to provide Tucker access to the financial and operating information of PET and Casco Bay Ford; (iv) fail[ed] to make distributions of PET cash flow when and as required; (v) conduct[ed] the business of PET in a manner designed to create expenses benefitting only Eric and Peggy or their other family members while decreasing net profits available to distribute to the members of PET (including Tucker) and (vi) intentionally or through acts of gross negligence, reduc[ed] the value of PET; all causing Tucker damage.

(Pl.'s Compl. ¶ 38.) Tucker also repeats and realleges all preceding paragraphs of his Complaint. Importantly, in paragraph 15, Tucker explains that even after the verdict rendered in the 2016 Lawsuit, Defendants have continued many of the same practices. Tucker asserts Defendants have actually increased PET's rent, and have continued to loan PET's money to their own entities, both in violation of the jury's findings in the 2016 lawsuit. Further, Tucker specifies that Defendants' refusal to distribute Cash Flow of PET in accordance with section 4.1.2. of the LLC Agreement is one of multiple wrongful acts that were not, and could not, have been dealt with in the 2016 Lawsuit. (Pl.'s Compl. ¶¶ 19, 22, 24.) Accordingly, the Court will not dismiss Tucker's claims raised in Count I. Tucker has alleged some of Defendants' wrongful actions, initially litigated in the 2016 lawsuit, have continued. Further, Tucker alleges additional wrongful actions that were not litigated at all in the 2016 Lawsuit. To the extent these claims are unclearly

articulated, Tucker's receipt of PET LLC's financial and operating information, as well as discovery, may or may not provide support for his allegations.

Counts II, IV, and V of Tucker's complaint, alleging breach of fiduciary duty against Defendant Peggy, civil conspiracy against both Defendants, and for a declaratory judgment, are based primarily on the same allegations as Count I. In addition, Count IV alleges both Defendants have conspired to deprive Tucker of the benefits of his ownership interest in PET. Likewise, Defendants justification for dismissal is the same; *res judicata* bars relitigating claims that were, or could have been litigated in the 2016 Lawsuit. This justification is similarly unpersuasive with regard to these claims. Accordingly, Tucker may proceed on Counts II, IV, and V.

Counts VI, VIII, and IX of Tucker's complaint all seek specific remedies: dissociation, injunctive relief/ specific performance, and punitive damages respectively. Defendants argue that in each case, Tucker cannot take a second bite at the apple for relief he should have requested in the 2016 Lawsuit. However, as acknowledged above, Tucker has adequately pleaded claims for both new, and continued wrongful conduct. The Court will not bar Tucker from requesting relief in the current lawsuit as a result of him not requesting the same type of relief in the 2016 Lawsuit.

### b. Plaintiff Does Not Fail to State a Claim

In addition to arguing Tucker's claims are barred by *res judicata,* Defendants contend Counts I and II relate to damages suffered by PET as opposed to damages suffered by Tucker individually and are therefore derivative claims. Only if Tucker's claims involved actual or threatened injuries *not* solely the result of an injury suffered or threatened to be suffered by the limited liability company, Defendants assert, would Tucker's claims be valid.

Defendants raised this very issue in the 2016 Lawsuit. *Cianchette v Cianchette*, CV-16-249, 2018 WL 1138457, at \*12 (Me. Super. Jan. 12, 2018). Derivative actions may be treated as direct actions "if justice requires." To determine if justice requires a derivative action be treated as a direct action, Courts consider whether claims involve oppressive action by majority shareholders against the interests of minority shareholders or alleged breaches of fiduciary duty owed to minority shareholders. *Id.* In this case, like the 2016 Lawsuit, Tuckers allegations, if proven, would constitute the oppression of a minority shareholder by two majority shareholders. Thus, Tucker's claims may be treated as direct actions under 31 M.R.S. § 1637(3)(A), as they were in the 2016 Lawsuit. *See Id.*

In Count IV, Tucker asserts Defendants engaged in a civil conspiracy against him. Defendants argue that even if the Court found the claim not barred by *res judicata,* it would still fail. Particularly, Defendants point to the perceived lack of tort claim against Eric, and argue without such a claim, a claim for conspiracy fails. Maine recognizes civil conspiracy where a tort is committed by one defendant, and other defendants are proven to have acted in concert with the commission of the tort. *See Cohen v. Bowdoin*, 288 A.2d 106, 112 (Me. 1972). Tucker states a tort claim for breach of fiduciary duty against Defendant Peggy, pertaining to her role as manager of PET. Therefore, Tucker can proceed with his civil conspiracy claim at this stage.

Finally, with respect to Count VI, Defendants assert Tucker lacks standing to bring his dissociation claim. In support, Defendants point to Section 1582 of the LLC Act. Specifically, Defendants cite language in Section 1582(5) that provides: "*On application by the limited liability company*, the person is expelled as a member by judicial order […]", to establish that the only avenue to such a judicial order is when requested by the LLC itself. 31 M.R.S. § 1582(5) (emphasis added). Despite Section 1582 discussing dissociation only when requested by the LLC

itself, an individual member may still apply for such relief in limited scenarios. The right of a member to maintain an action to enforce a right of an LLC is acknowledged in the LLC Act. 31 M.R.S. § 1632. As stated previously, an action which might otherwise be derivative may be brought directly by a minority member "if justice requires." 31 M.R.S. § 1637(3)(A). Courts will consider the possibility of minority member oppression when considering if justice requires. Tucker alleges facts that, if proven, establish his oppression as a minority member. Accordingly, the Court will not dismiss Tucker's claim for dissociation at this stage.

### c. Plaintiff is Not Entitled to Seek Attorney's Fees

As part of his complaint, Tucker requests attorney fees as part of his potential damage award. Defendants seek dismissal of this request. In the absence of contractual or statutory liability, counsel fees are not recoverable either in tort or contract actions.[2] *Soley v. Karll,* 2004 ME 89, ¶ 10, 853 A.2d 755, 758 (Me. 2004); *Gagnon v. Turgeon*, 271 A.2d 634 (Me. 1970). Neither the LLC Agreement, nor the LLC Act include a provision granting attorney fees in potential litigation. Accordingly, Tucker's claim for counsel fees is dismissed.

### d. Counts III, VII, VIII and IX of the Complaint May Proceed Despite Not Existing as Independent Claims

Defendants contend Counts III, VII, VIII, and IX of the Complaint must be dismissed as they seek a specific remedy but do not set for the underlying claim upon which relief can be granted. This argument is unpersuasive.

Maine is a notice pleading state. Notice pleading requires that a complaint give "fair notice of the cause of action" by providing a short and plain statement of the claim showing that

---

[2] Plaintiff cites *Samsara Memorial Trust v. Kelly, Remmel & Zimmerman,* 2014 ME 107, ¶ 48, 102 A.3d 757 for the proposition that the Court has inherent power to award attorney fees if it deems necessary to fully compensate a plaintiff for their loss or injury suffered. In *Samsara,* the Court authorized the award of attorney fees after concluding the Maine Fraudulent Transfer Act authorized such an award.

the pleader is entitled to relief. *Burns v. Architectural Doors and Windows,* 2011 ME 61, ¶ 16, 19 A.3d 823 (citing M.R. Civ. P. 8(a)(1)). A complaint need not identify the particular legal theories that will be relied upon, but it must describe "the essence of the claim and allege facts sufficient to demonstrate that the complaining party has been injured in a way that entitles him or her to relief." *Id.* at ¶ 17 (citing *Johnston v. ME. Energy Recovery Co.,* 2010 ME 52, ¶ 16, 997 A.2d 741). Neither Maine's notice pleading standard, nor the Maine Rules of Civil Procedure require Plaintiffs to plead their claims and relief sought in single counts. Additionally, Maine Courts have previously rejected arguments that damage claims should be denied because they were pled as a separate count, noting that separate counts merely put the Court on notice of the damage claims. *See Murray v. Murray*, No. CV-05-161, 2006 WL 5255496, at *3 (Me. Super. Dec. 13, 2006). Thus, Plaintiff may proceed on Counts III, VII, VIII, and IX at this stage.

### e. Defendants' Motion for a More Definite Statement is Denied

Finally, in the alternative to their motion to dismiss, Defendants request the court order Tucker to provide a more definite statement of claims asserted against them. Generally, a motion for a more definite statement is available only where a defendant could not reasonably be required to frame their answer to a pleading because of its vagueness or ambiguity. *Nadeau v. Fogg*, 145 Me. 10, 70 A.2d 730 (1950); *Brown v. Rouillard,* 117 Me. 55, 102 A. 701 (1917). A motion for a more definite statement under Rule 12(e) is not designed to act as a substitute for discovery, or to merely insure a defendant is better prepared for trial.

In his complaint, Tucker asserts Defendants have continued certain behaviors deemed wrongful in the 2016 Lawsuit. Particularly, Tucker alleges Defendants have continued to artificially inflate the rent paid from PET to another company owned by Defendants, and that they have continued to loan PET's money to their own entities in violation of the jury's findings

13

in the 2016 Lawsuit and their duties under the LLC Agreement, and LLC Act. (Pl.'s Compl. ¶ 15.) Tucker also alleges Defendants have engaged in additional wrongful acts and acts of oppression, specifically: withholding year-end cash flow distributions from Tucker, refusing to provide Tucker with PET's financial documents, and using PET's financial resources for their own personal use. (Pl.'s Compl. ¶¶ 19, 22, 24.) These facts, as alleged, are sufficient to put Defendants on notice of the claims asserted against them. Defendants can be reasonably expected to frame an adequate answer to the pleadings. Thus, Defendants' motion for a more definite statement under Rule 12(e) is denied.

## CONCLUSION

In summary, Defendants' motion for a partial judgment on the pleadings is granted. The Court agrees with Defendants that the PET LLC Agreement allows Defendants to initiate a "Capital Transaction", a process by which a business dissolution may be achieved. The Court expresses no opinion here about the *execution* of the process, as it has not yet begun. The Defendant's motion to dismiss or for a more definite statement is GRANTED only with respect to attorney fees, but is otherwise DENIED for the remainder of Plaintiff's claims.

The Clerk of the Business and Consumer Court will schedule a telephonic conference between the Court and counsel for the parties to implement a Case Management Scheduling Order. The teleconference will also address a possible stay of the business dissolution process until discovery has been completed.

14

The Clerk is requested to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).


Dated:  December 16, 2019                           ____/s_____

                                                   **Justice M. Michaela Murphy**
                                                   **Business and Consumer Court**